**In re The FIRST UNION CORP. SECURITIES LITIGATION.**

No. 3:99CV237–MCK.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Jan. 10, 2001.

Steven G. Schulman, Samuel H. Rudman, Russell J. Gunyan, New York City, NY, for R. Allen.

Edward T. Hinson, Ann L. Hester, James, McElroy & Diehl, Charlotte, NC, Richard J. Morvillo, Jeffrey B. Maletta, Jeffrey F. Robertson, Nicholas G. Terris, Kirkpatrick & Lockhart, LLP, Washington, DC, for Edward E. Crutchfield, John R. Georgius, James H. Hatch, First Union Corp.

## ORDER

McKNIGHT, United States Magistrate Judge.

**This matter** is before the Court with the consent of the parties for ruling on Defendants' Motion to Dismiss. [Doc. 41.] Oral argument was held on the motion and the matter is now ripe for resolution.

## OVERVIEW

Twelve class action suits were filed against Defendant First Union and its directors. These suits were consolidated in this Court with *Allen v. Crutchfield* as the lead case. The complaint and amended complaint allege securities fraud under Section 10(b) of the Exchange Act consisting of: (1) misrepresentation by officers in statements and omissions regarding the effects on earnings of First Union's acquisitions; and (2) violations of GAAP (Generally Acceptable Accounting Procedures) as to certain losses.

More specifically, regarding misrepresentations in statements and omissions,

Plaintiffs allege that during the class period of August 14, 1998, to May 25, 1999, First Union's stock was artificially inflated because First Union misrepresented the effects of integrating recent acquisitions into First Union's corporate structure. Primarily the allegations concern the acquisition of CoreStates, a rival bank which comprised one-third of First Union's total value post-acquisition, in August of 1998. It is uncontested that problems during the integration of CoreStates into First Union's structure caused customer and financial loss resulting in the revised lowered expectations for earnings announcement in May. This announcement caused stock prices to hit a seven-year low, resulting in allegedly "heavy" losses for Plaintiffs. Plaintiffs allege the officers knew about the problems but made statements or omissions representing to the public that the integration was going smoothly. Pointing to Defendants' selling of their own shares of First Union stock during the class period, Plaintiffs base their fraud claim on Defendants' motive and opportunity to defraud investors for personal gain.

Defendants respond that the directors' sales of stock were relatively small compared to their net holdings and that each director actually owned more First Union stock at the close of the class period than at the beginning, belying any motive argument. As to the statements identified as misleading, Defendants respond that none are actionable because they were either (1) made by analysts or other non-First Union people; (2) not shown to be false when made; (3) statements that, under caselaw, would be deemed "puffery" that no reasonable investor would rely on; or (4) they were protected statements under the safe-harbor provisions of the Private Securities Litigation Reform Act (protecting "forward-looking" statements if identified as such with cautionary language). As to omissions, or failure to warn the public of problems, First Union responds that either it released that information as it became available or that the problems were report-

ed in the press. Regarding the GAAP allegations, First Union responds that the procedures used do not constitute violations of GAAP. For the reasons discussed below, this Court finds that Plaintiffs cannot meet their burden under the applicable pleading standards, and as such, the motion to dismiss should be granted.

## I. Relevant facts and related allegations

The following facts are either taken from the Amended Complaint and the documents referenced therein or are facts of which this Court takes judicial notice.[1]

### A. First Union and Its 1998 Acquisitions

First Union is a Charlotte, North Carolina-based bank holding company that provides financial services and products. Doc. 1, Compl. ¶ 15. During the relevant time periods, the three individual Defendants were all officers of the Company. Edward Crutchfield served as First Union's Chairman and Chief Executive Officer. Compl. ¶ 16. John Georgius was First Union's President from January 1998 until August 1999. *Id.* ¶ 17; *see also* Appendix Tab I (Annual Report on Form 10–K for the year ended December 31, 1998 ("1998 Form 10–K") at 8).[2] James Hatch was First Union's Senior Vice President and Corporate Control Accounting Officer. *Id.* ¶ 18.

First Union is the nation's sixth largest bank with assets of over $237 billion. It has achieved that growth in large part due to acquisitions. *See* Appendix Tab 1 (1998 Form 10–K Annual Report at i). Since 1985, First Union has completed nearly eighty acquisitions, as the Company grew from 5,000 to more than 75,000 employees. Appendix Tab 1 (1998 Form 10–K) at 1.

The $20 billion CoreStates acquisition, completed April 28, 1998, was First Un-

ion's largest. It stands at the heart of this cause of action. While the relevant class period starts in August 1998, First Union's disclosures concerning the CoreStates acquisition began nine months earlier. On November 18, 1997, First Union issued a press release ("November 18, 1997 press release") and filed a Report with the SEC on Form 8–K ("November 18, 1997 8–K") announcing its intent to acquire CoreStates, subject to several conditions, including regulatory approvals. Appendix Tab 2 (November 18, 1997 8–K and press release). The November 18, 1997 press release expressed the Company's hope that the CoreStates merger would be "cumulatively accretive within 18 months"—that it would improve the combined earnings of the institutions by mid–1999. *Id.* at 2. At the same time, First Union cautioned investors about risks in the acquisition. For example, the November 18, 1997 8–K stated that the merger announcement contained forward-looking statements, specifically identifying "statements related to cost savings, enhanced revenues and accretion to reported earnings that may be realized from the [CoreStates] Merger." Appendix Tab 2 at 3. More specifically, the November 18, 1997 8–K warned that the Company's expectations might not be met:

> Such forward-looking statements involve certain risks and uncertainties, including a variety of factors that may cause the Corporation's actual results to differ materially from the anticipated results or other expectations expressed in such forward-looking statements. Factors that might cause such a difference include, but are not limited to: (1) expected cost savings from the Merger and the Corporation's other pending acquisitions may not be fully realized or realized within the expected time frame; (2) revenues following the Merger and the oth-

---

1. The relevance and propriety of evidence considered is discussed, *infra,* at II(A).

2. Copies of documents cited in this order are annexed to the Declaration of Jeffrey F. Robertson. As the parties referred to the Robert-

son Declaration and its annexed documents as the "Appendix," and referred to documents cited therein as "Appendix Tab____," so shall this Court for ease of reference.

er pending acquisitions may be lower than expected, or deposit attrition, operating costs or customer loss and business disruption following the Merger and the other pending acquisitions may be greater than expected; (3) competitive pressures among depository and other financial institutions may increase significantly; (4) costs or difficulties related to the integration of the business of the Corporation, CoreStates, and the other pending acquisitions may be greater than expected; ... and (8) changes may occur in the securities markets.[3] Appendix Tab 2 (November 18, 1997 8–K) at 3.

On February 27, 1998, First Union announced that it expected to consummate[4] the CoreStates acquisition by April 30, 1998. Appendix Tab 3 (February 27, 1998 press release).[5] On April 13, 1998, the Federal Reserve Board approved the CoreStates acquisition, Appendix Tab 5 (April 13, 1998 press release), and First Union reported on steps it was taking to integrate the operations of the two institutions. Appendix Tab 6 (April 27, 1998 press release). The merger was consummated on April 28, 1998. Appendix Tab 7 (April 28, 1996 8–K).

In the months that followed, the Company continued to advise the public that ex-

pectations for the CoreStates acquisition might not be met. For example, on page one of its Annual Report on Form 10–K for the year ending December 31, 1997 ("1997 Form 10–K"), filed on March 23, 1998, First Union stated that anticipated expense savings and revenue enhancements from the CoreStates acquisition, among other factors, could cause the Company's results to differ materially from the Company's forward-looking statements. Appendix Tab 8 at 1. The 1997 Form 10–K, like the Company's pronouncements before and during the "Class Period", also incorporated the risk factors that had been included in the November 18, 1997 8–K.[6]

## B. Statements during the Class Period

On August 14, 1998, First Union filed its Report on Form 10–Q for the second quarter ended on June 30, 1998 ("1998 Second Quarter 10–Q"), which made the following statements about integration of First Union's 1998 acquisitions:

> We are very pleased with our progress in integrating recent acquisitions and with the growth prospects stemming from these transactions. We believe 1998 will continue to be a very active year as we work to develop new markets and business strategies into revenue growth. In addition to revenue growth,

---

3. The November 18, 1997 Release also warned that expectations as to cost savings, revenue enhancements and accretion might not be met.
   > These estimates and projections constitute forward-looking statements (within the meaning of the [Reform Act]), which involve significant risks and uncertainties. Actual results may differ materially from the results discussed in these forward-looking statements. Factors that might cause such a difference include, but are not limited to, those discussed in First Union Corporation's Current Report of Form 8K, dated November 18, 1997 ...

4. This term is used by the parties, rather than "complete" as what constitutes the "completion" of the merger is in dispute.

5. Shortly thereafter, on March 4, 1998, First Union announced the acquisition of The Money Store, Inc. ("Money Store"), a provider of

home equity, small business and student loans. Compl. ¶ 30: *see also* Appendix Tab 4 (March 4, 1998 press release).

6. Similar warnings about the factors that could adversely affect First Union's performance were made in the Company's public filings and press releases both before and during the "Class Period." Appendix Tab 9 (November 28, 1997 8–K) at I; Appendix Tab 10 (December 2, 1997 8–K) at 1; Appendix Tab 11(1998 First Quarter 10–Q) at 1; Appendix Tab 12 (1998 Second Quarter 10–Q) at 1; Appendix Tab 13 (1998 Third Quarter 10–Q) at 1; Appendix Tab 14 (January 26, 1999 8–K) at 1; Appendix Tab 15 (March 19, 1999 8–K) at 1; Appendix Tab 1 (1998 10–K) at 1; Appendix Tab 16 (May 5, 1999 8–K) at 1; and Appendix Tab 17 (May 25, 1999 8–K) at 1.

we expect further improvements in efficiency as we begin to benefit from the consolidation of our recent acquisitions. With our previously pending acquisitions now completed, our primary attention is focused on developing our existing business base as we continue to invest in new technology and fee income-generating lines of business.

The acquisition of CoreStates of Philadelphia will create new opportunities to leverage our growing Capital Management and Capital Markets businesses in states that generate 36 percent of the nation's gross state product and in attractive consumer markets where the per capita income is 12 percent above the national average. In addition, in the second Quarter of 1998, we completed the purchase accounting acquisitions of Bowles Hollowell Conner & Co., an investment banking firm, and The Money Store, a nationally recognized consumer finance company.

Compl. ¶¶ 36–37.

First Union shared other information with investors during this period including the 1998 Second Quarter 10–Q's cautionary language similar to that contained in the 1997 Annual Report. Appendix Tab 12 (1998 Second Quarter 10–Q) at 1. Further, First Union's detailed discussion of its operating results included the following disclosure:

> Merger-related and restructuring charges in the·first six months of 1998 of $653 million after tax were associated primarily with the April 28, 1998 acquisition of CoreStates Financial Corp.[7]

*Id.* at 2. The Company also disclosed that additional expenses, excluding merger-related charges, jumped to $3.8 billion in the first half of 1998, "primarily due to ... ongoing expenses related to acquired enti-

ties," and that there had been a decline in tax-equivalent net interest income due, among other things, to "purchases to leverage the CoreStates acquisition." *Id.* at 9. Likewise, the Company predicted that "an additional $165 million in after-tax merger-related and restructuring charges related to CoreStates may be recorded by the end of 1998." *Id.* at 10.[8]

Between August 14 and November 13, 1998, the day the Company filed its Report on Form 10–Q for the quarter ended September 30, 1998 ("1998 Third Quarter 10–Q"), the integration of the now-completed acquisitions of CoreStates and the Money Store was on-going. The conversion of First Union's and CoreStates' computer systems was not completed until November 1998 and, as such, it was not until then that First Union had access to CoreStates' operating results in one integrated system of reports. Thus, First Union promptly disclosed what it learned from that information.

First Union made other public comments indicating that there were hitches in the integration process. The media issued several reports on problems First Union was experiencing. For example, in early November when First Union converted CoreStates' computers to a combined system, one newspaper reported that:

> long lines of customers and cars crowded former CoreStates branches and drive up windows last week, as bank workers coped with new systems and fees.... Rival banks ... are hoping frustration over changing fees, branch closings and other merger issues would drive former customers of the region's biggest bank to move their money elsewhere.

Appendix Tab 19 (*Pittsburgh Post–Gazette,* November 10, 1998, at C–8). Still

---

**7.** By contrast, merger-related and restructuring charges in the first half of 1997 were $37 million.

**8.** Though Plaintiffs' Amended Complaint did not take note of these disclosures, evidently

investors did. The price of First Union's stock declined $2, from $55 ⅜ to $53 ⅜ on this the first day of the "Class Period." Appendix Tab 18 (stock price summary).

other accounts quoted First Union officials, "weary from the many public relations problems that have plagued the merger," as saying "Nothing is ever a 10 [on a scale of 1 to 10]. Not something this big, anyway." Appendix Tab 20 (*American Banker*, November 18, 1998, at 6). That article, which Plaintiffs cite, notes that:

First Union officials don't deny there were a few bumps in the road. Customers faced long lines at many branches during the 10 day conversion, and at one point the entire First Union branch network had to deal with a 45–minute computer glitch that forced tellers to work off-line.

*Id.* Compl. ¶ 50.

First Union filed its 1998 Third Quarter 10–Q in mid-November, after the investing public had already been made aware of problems associated with the integration efforts by the above comments.

That 10–Q again reminded investors of the uncertainties the Company was facing. It reported earnings of $2.7 billion or $2.77 per share for the nine months ended September 30, 1998. Appendix Tab 13. In addition, it repeated warnings about its operating results and cautioned investors about the forward-looking nature of statements contained in the report. Among the factors that First Union warned could affect the accuracy of its predictive statements were its "acquisitions," and related factors. *Id.* at 1. With particular reference to the CoreStates merger, the Form 10–Q provided additional cost information, noting, for instance, that First Union took after-tax merger-related and restructuring charges of $669 million during the first nine months of 1998, compared with only $37 million the prior year. *Id.* at 2. In reporting on the completion of the CoreStates integration, First Union observed in statement it identified as forward-looking that:

[c]ustomer sales and retention strategies are well under way, as well as efforts to achieve expense efficiency targets by the end of 1998. As such, we are very pleased with our prospects for revenue growth and expense reductions stemming from this and other recently consolidated acquisitions.

*Id.* at 3 (emphasis added).

The Amended Complaint alleges that these statements were false and misleading because, while the merger and the conversion of separate information systems may have been finalized, the integration of CoreStates was not really complete and that retention strategies were not working. Compl. ¶ 54. Thus, Plaintiffs conclude "the Company had no basis to he pleased." *Id.*

However, there were public reports identifying problems with the conversion during this period. For example, in late November 1998, First Union announced a computer problem caused by VISA and Microsoft's "Money" software that resulted in double-billing some accounts prior to its being remedied. Appendix Tab 21 (*The Charlotte Observer*, November 21, 1998). Likewise, the Company reported a temporary problem with its direct-deposit systems. Appendix Tab 22 (*Philadelphia Inquirer.* December 2, 1998, at C3). Other anecdotal problems were detailed in news accounts. For instance, the *Philadelphia Inquirer*, on December 29, 1998, commented that:

First Union's purchase of Philadelphia's CoreStates has been great for business—say analysts who follow rival Commerce Bancorp. In the weeks before the [First Union–CoreStates] conversion became official ..., Commerce [Bancorp] ... won nearly 40 percent of its new accounts from First Union/CoreStates ... That's up from 26 percent during the previous two years.[9]

---

9. The article also quotes analysts observing that Philadelphia-area banks were giving First Union "tougher-than-expected" competition

for customers in the former CoreStates territory. Curiously, Plaintiffs, citing this same article for another purpose (Compl.¶ 122), ig-

Appendix Tab 23 (*Philadelphia Inquirer*, December 29, 1999, at 2).

The Complaint cites a December 16, 1998 press release relating to efforts to market the Company's mutual fund and investment products overseas. That release stated, in part:

> The International Division serves more than 1,400 correspondent bank account relationships in more than 130 countries, through 5 foreign branches and 29 representative offices abroad. Through its acquisition of Corestates Bank, First Union has maintained a presence in Japan since 1975.

Compl. ¶ 56.

Plaintiffs contend that this statement reflecting CoreStates' presence overseas was misleading because it failed to disclose "the multitude of problems the Company was then experiencing with its international operations." Plaintiffs present no evidence that these problems warranted disclosure.

### C. Reduction of Earnings Estimates

Following the November 1998 conversion of the CoreStates systems, First Union revised its earlier estimates. On January 26, 1999, First Union issued an early warning of the prospect of reduced earnings for 1999. Compl. ¶¶ 64–65; Appendix Tab 25 (January 26, 1999 press release) at 1. In its press release, First Union announced that it would eliminate its "gain on sale treatment" of securitization activities related to certain loans and that it was cutting 1999 earnings expectations by 8 to 12 cents per share. Appendix Tab 25. The release noted that the "accounting change, uncertainty in the economy and our continued investments in strategic initiatives" led the Company to conclude that lower goals were appropriate. *Id.* The press reported that, despite cost-cutting efforts, First Union expected to miss its savings goals by $50 million and its revenue goals by $100 million, as a result of the CoreStates merger. Appendix Tab 26 (*Philadelphia Inquirer*, January 28, 1999, at C1); *see also* Appendix Tab 27 (*The Charlotte Observer*, January 31, 1999). At the same time, the Company announced an extra $150 million in expenditures to complete its "Future Bank Initiative," its effort to streamline service and to direct more customers to ATMs and telephone banking. Appendix Tab 26 (*Philadelphia Inquirer*, January 28, 1999, at C1).

Plaintiffs allege that this warning was false and misleading because it failed to reveal the "magnitude and severity" of the integration problems and as a result "lulled" investors into believing that the problems would result in "marginally" decreased earnings. Compl. ¶ 66. As Defendants point out, the investing public, was hardly "lulled." Following the Company's January 26 disclosures, First Union's stock dropped about 9 percent (Compl.¶ 8), its biggest drop in seven years. Appendix Tab 18 (stock price chart) *see also* Appendix Tab 28 (*New York Times*, January 28, 1999, at C–4).

Despite the market's reaction to First Union's warning, Plaintiffs assert that the Company's 1998 Form 10–K, filed March 16, 1999, was misleading. Appendix Tab 1. The 1998 Form 10–K included financial statements audited by KPMG LLP ("KPMG"), the Company's outside auditors. KPMG certified that First Union's financial statements "present fairly, in all material respects, the financial position . . . for each of the three years ended in the three year period ended December 31, 1998, in conformity with generally accepted accounting principles." *Id.* at C–2. The 1998 Form 10–K stated that "we completed the CoreStates conversion. Customer sales and retention strategies are well under way, as well as efforts to realize expense efficiencies. As such, we are encouraged with our prospects for revenue growth and for expense reductions in 1999

---

nore the article's discussion of the loss of former CoreStates customers—even as they

claim the public was in the dark about such matters.

stemming from this and other recently consolidated acquisitions." Compl. ¶ 70. The 1998 Form 10–K also observed:

> Four 1998 acquisitions expanded our product line and added scale for our products and services . . . We provided a full range of products to the former CoreStates customer base, leveraging CoreStates' expertise in global trade finance with First Union's broader geographic coverage and Capital Markets capabilities.

Compl. ¶ 69 (emphasis in Complaint). First Union also repeated its warnings that 1999:

> will be a challenging year for the financial services industry, including First Union. Accordingly, in late January 1999, we announced a modified goal for 1999 operating earnings per share growth.

Appendix Tab 1 (1998 Form 10–K Annual Report) at 8.[10]

Shortly thereafter, First Union issued further disclosures. On March 19, the Company issued a press release that, while reaffirming its most recent outlook for 1999 earnings, announced that management had "taken decisive action" to "reduce operating expenses." Appendix Tab 29 (March 19, 1999 press release).[11] The Company stated that these cuts were aimed at cutting pre-tax costs by $400 million to bring expenses in line with revenues. Appendix Tab 30 (*The Charlotte Observer*, March 20, 1999) *see also* Appendix Tab 31 (*Richmond Times Dispatch*, March 20, 1999, at C–i). The Company also disclosed merger-related and restructuring charges of $380 million for the quar-

ter, including $30 million related to the CoreStates merger and restructuring. Appendix Tab 29 (March 19, 1999 press release) at 1–2; *see also* Appendix Tab 31.

On April 15, First Union announced first quarter 1999 results in line with its revised lower projections. Appendix Tab 32 (April 15, 1999 press release) at 1. As predicted, first quarter earnings were $706 million, down 11% from the prior year, even with $118 million from the sale of the Company's Electronic Data Systems holdings. *Id.* The Company's release also explained that these earnings figures included a $259 million charge incurred for the CoreStates acquisition. *Id.* The release quoted Mr. Crutchfield as being satisfied "with the disciplined way our company focused on reducing our cost structure" as the Company announced in March. Compl. ¶ 75. He again cautioned, however, that 1999 would continue to be "a challenging year" that would require First Union to control costs and gain new sources of revenue *Id.* *See also* Appendix Tab 33 (*Washington Times*, April 21, 1999, at B–9).

The Amended Complaint alleges that Mr. Crutchfield's statement was false and misleading in that he failed to disclose the specific problems and costs the Company was facing. Compl. ¶ 76. At the same time, the Amended Complaint fails to identify the particular facts Mr. ·Crutchfield knew that supposedly rendered his statement misleading.

Similarly, Plaintiffs contend that First Union's Form 10–Q for the first quarter of 1999 ("1999 First Quarter 10–Q"), filed May 5, 1999, was false and misleading. The 1999 First Quarter 10–Q reflected the

---

**10.** Plaintiffs assert that the 1998 Form 10–K was false because no "full range of products" had been provided due to systems problems and because of problems with foreign operations. Yet Plaintiffs offer no facts indicating that any product or service was generally unavailable or that the statement was otherwise materially inaccurate. Plaintiffs also allege that, though the CoreStates merger had been completed, the "conversion" was not complete and there was no reasonable prospect of expense reduction. Compl. ¶ 73. But,

again, the Amended Complaint cites no specific facts in existence at the time to contradict the Company's statements.

**11.** The press release again warned investors that it contained various forward-looking statements that could be affected by factors beyond the Company's control, but that the Company identified in its SEC filings. *Id.* at 2.

foregoing operating results and also disclosed that noninterest expenses during the quarter increased to $2.5 billion, primarily as a result of merger-related and restructuring charges, including increased personnel costs. Appendix Tab 16 (1999 First Quarter 10–Q) at 2. Apart from its assertion that the report failed to disclose the Company's problems integrating CoreStates, the Amended Complaint fails to allege that any specific statement in this filing was inaccurate.

More than seven months before year end, First Union told investors to expect even lower 1999 earnings. On May 25, 1999, the Company announced that, notwithstanding its restructuring and cost-cutting measures, it did not expect to meet revised earnings estimates. Compl. ¶¶ 80–81; Appendix Tab 34 (May 25, 1999 press release). First Union observed that, during the first half of 1999, it was

> faced with overcoming the impact of substantial 1998 unusual noncore earnings items, major acquisition integration and acceleration of spending for major initiatives as we deploy a new business model ... This is an important transition year as we strategically reposition our company for the future. We are compressing a number of initiatives and acquisition consolidation into a short time frame.

Appendix Tab 34 (May 25, 1999 press release). The Company stated that revenue shortfalls were due mainly to lagging revenue growth in the former CoreStates territory, which failed to match the Company's expectations, as well as disappointing Money Store results, implementation of the Future Bank project and, finally, its decision not to realize certain securities gains it previously expected. *Id.* at 2.

Following First Union's announcement, the price of First Union stock fell by $47 ⁵⁄₁₆ to $45 5/8. Appendix Tab 18 (stock price summary). The first securities fraud lawsuit was filed within two weeks of First union's May 25, 1999 announcement. By August, twelve nearly identical suits had been filed, all of which have been consolidated here.

## D. Accounting Allegations

Although not alleged in the original complaint, the Amended Complaint added 26 new paragraphs describing First Union's accounting treatment of the gain or losses on certain mortgage-backed securities. Compl. ¶¶ 91–116. These securities related to First Union's asset securitization program, through which the Company or its predecessors made loans, combined the loans into pools and sold interests in those pools. *Id.* ¶ 92. In the case of home equity and home improvement loans, the Company often kept a residual interest in the pools consisting of a right to receive a portion of the interest paid on the loans. These "interest only" residual interests, defined in the Complaint as Mortgage Backed Securities, were carried on the Company's books as "trading securities," and their fair value was calculated on a monthly basis using various assumptions about interest rates and anticipated default and prepayment rates. Appendix Tab 12 (1998 Second Quarter 10–Q) at 11–12. The existence of the securities, the methodology for valuing them, the assumptions used in valuing them, the fair value of these securities, and the gain or loss to the Company, were disclosed in the Company's periodic reports. *See id.; see also* Appendix Tab 13 (1998 Third Quarter 10–Q) at 12–13.

In 1999, in accordance with a newly promulgated accounting standard, First Union changed its method of accounting so that a loss was recorded only when the securities were deemed to be impaired. Appendix Tab (1998 Form 10–K Annual Report) at 17. First Union took a $19 million impairment loss in the First Quarter of 1999, and a $60 million impairment loss in the Third Quarter of 1999. Appendix Tab 16 (1999 First Quarter 10–Q) at T–11 and Tab 35 (1999 Third Quarter 10–Q) at 7–8.

Plaintiffs allege in conclusory terms that, due to disruptions in market conditions in the Fall of 1998 resulting in a "flight to quality," these securities should have been revalued in that year, but that the loss was deferred to conceal problems with the Money Store merger. Compl. ¶¶ 97–98. The Amended Complaint contains no specific factual averments buttressing Plaintiffs' claims; instead this claim appears to be premised exclusively on the supposition that the 1999 revaluation proves that Defendants knew of the impairment at an earlier time. Thus, despite the absence of any supporting factual allegations, Plaintiffs allege First Union's pre-tax earnings in 1998 were overstated by at least $79 million—the amount of the impairment recognized in 1999. Compl. ¶ 104.

## II. Applicable Pleading Standards

The Amended Complaint alleges that each of the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (1994), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1999). Plaintiffs further allege that the individual Defendants are "controlling persons" of First Union under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (1994), and are therefore individually liable for the Company's alleged violations of Section 10(b) and Rule 10b–5.

### A. Rule 12(b)(6)

A motion to dismiss pursuant to Fed. R.Civ.Pro. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing the complaint, the Court accepts all well-pled allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir.1997).

In deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the complaint. In securities fraud actions, courts will also "examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent," including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely. *See, e.g., Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir.1999) (court considered news article and company proxy statement); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274–1281 (11th Cir.1999) (judicial notice of SEC filings); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) (even if plaintiffs' complaint does not refer to it, "a district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiffs complaint necessarily relies."), *cert. denied*, 525 U.S. 1001, 119 S.Ct. 510, 142 L.Ed.2d 423 (1998); *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458–59 (9th Cir. 1995) (judicial notice of widespread layoffs at Hughes Aircraft based on a newspaper article); *In re FAC Realty Sec. Litig.*, 990 F.Supp. 416, 420 (E.D.N.C.1997) (Court could properly rely on press release and other public statements made by company and company's Form 10–K in ruling on motion to dismiss).

To survive the motion to dismiss, Plaintiffs must have alleged facts that show they are entitled to relief on their causes of action. To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must sufficiently allege that:

1.   the defendant misstated or omitted a material fact;

2.   the defendant acted with scienter;

3.   the plaintiff justifiably relied upon the misstatement or omission; and

4.   the misstatement or omission proximately caused the plaintiff's loss.

*See e.g., Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999). As discussed below, Plaintiffs have failed to satisfy, as a matter of law, the first and second requirements, and their Complaint should be dismissed.

### B. Rule 9(b)

■ Because § 10(b) claims are fraud claims, Plaintiffs must further satisfy the pleading requirements imposed by Fed. R.Civ.Pro. 9(b). Rule 9(b) requires that plaintiffs plead all of the elements of fraud with particularity. Particularity of pleading is required with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud—the "who, what, where, why and when." *See, e.g., Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776 (4th Cir.1999); *In Re Criimi Mae,* 94 F.Supp.2d 652 (D.Md.2000); *Apple v. Prudential–Bache,* 820 F.Supp. 984 (W.D.N.C. 1992), *aff'd sub. nom.* 1993 WL 138523 (4th Cir.1993). As one court observed:

> Rigorous application of Rule 9(b) by the courts is especially important in securities fraud cases, where the potential for "strike suits" is serious. Thus, Plaintiffs must make particular allegations of the time, place, speaker, and contents of the allegedly false statements, as well as the manner in which the statements are false and the specific facts raising an inference of fraud.

*In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 960 (D.Md.1995). Additionally, Plaintiffs are forbidden from "group[ing] defendants together without specifying which defendant committed which wrong" and are required instead to "set forth with particularity each defendant's culpable conduct." *Apple v. Prudential–Bache Sec., Inc.,* 820 F.Supp. at 987 (W.D.N.C.1992); *Juntti v. Prudential–Bache Sec., Inc.,* No. 92–2066, 1993 WL 138523 (4th Cir. May 3, 1993). Plaintiffs are required to disclose in their pleadings the sources upon which their allegations rest, and courts will evaluate the sufficiency of the allegations in light of the reliability of the sources. *Apple v. Prudential–Bache Sec., Inc.,* 820 F.Supp. at 986.

The Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u–4(b)(2), both codifies these requirements and imposes additional pleading requirements. For example, the Reform Act requires plaintiffs to identify each allegedly misleading statement and to specify the reason or reasons each statement was untrue or misleading at the time it was made. 15 U.S.C. § 78u–4(b)(1) (Supp. IV 1998). Moreover, where a complaint makes allegations on information and belief, plaintiffs must "state with particularity all facts on which that belief is formed." *Id.*

The Reform Act also preserves a plaintiff's obligation to base a Section 10(b) claim on statements that are not only factual but also material. Conf.Rept. at 44, reprinted in U.S.C.C.A.N. at 743 ("Courts may continue to find a forward looking statement immaterial and therefore not actionable."). Thus, each allegedly false or misleading statement must be evaluated for materiality. Further, under the Reform Act, when statements are "forward-looking," they are not actionable at all, even if material, when they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ. 15 U.S.C. § 78u–5(c)(1) (Supp. IV 1998).

Most notably, in addition to the requirements for pleading a material false statement or omission, Plaintiffs also must satisfy the Reform Act's requirements for pleading the requisite state of mind as to each defendant:

> [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (Supp. IV 1998).

■ Under this provision, the mental state needed to prove securities fraud is

distinct from the level of pleading required to permit inference of that mental state. With respect to the requisite mental state, the Reform Act's dictates vary, to some extent, with the nature of the allegedly false statements. For those few "forward-looking statements" that are actionable at all, the Reform Act specifies that the required state of mind is "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c) (Supp. IV 1998). For statements outside the statutory safe harbor, the "required state of mind" in Section 78u–4(b)(2) refers to the scienter requirement applicable to Rule 10b–5 claims prior to the Reform Act. *See, In re Comshare,* 183 F.3d 542, 550 (6th Cir.1999); *Phillips v. LCI Int'l. Inc.,* 190 F.3d at 620.

■ The Supreme Court has defined "scienter" as a mental state embracing "intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Although the Court left open the question whether recklessness satisfies this standard, the Fourth Circuit has defined scienter restrictively: "Scienter exists if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading." *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.,* 132 F.3d 1017, 1037 n. 26 (4th Cir.1997) (citation omitted). *See also Malone v. Microdyne Corp.,* 26 F.3d 471, 479 n. 9 (4th Cir.1994). Most recently, the Fourth Circuit held that "to establish scienter, a plaintiff must still prove that the defendant acted intentionally, which may perhaps be shown by recklessness." *Phillips v. LCI Int'l. Inc.,* 190 F.3d at 620.

As to the distinct issue of how plaintiffs must plead intent, the Reform Act "indisputably seeks to make pleading scienter more difficult for plaintiffs." *Phillips v. LCI Int'l, Inc.,* 190 F.3d at 621 (citations and quotation marks omitted). While courts have disputed precisely how stringently the Reform Act pleading standard should be interpreted, *see id.,* there is no disagreement on one critical point: the Reform Act imposes a stricter standard than was previously employed. At a minimum, that standard is the Second Circuit's pre-Reform Act pleading requirement, which was the most stringent at the time, requiring plaintiffs to plead: (1) facts establishing a motive to commit fraud and an opportunity to do so or (2) facts constituting circumstantial evidence of either reckless or conscious behavior. *In re Time Warner Inc. Sec. Lit.,* 9 F.3d 259, 269 (2nd Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).[12] Indeed, all five Courts of Appeal that have squarely addressed the issue have held that the Reform Act elevated the pleading standard above the pre-Reform, Act Second circuit standard; in addition, with the apparent exception of the Third Circuit, all have held that merely pleading motive and opportunity no longer suffices.[13]

---

12. The legislative history confirms that Congress intended the Reform Act to elevate the pleadings standards above those that were previously applied in the Second Circuit. The Conference Report expressly states that Congress was adopting the Second Circuit's pleading standard only "in part" because Congress intended to "strengthen" that standard. Conf.Rep. at 41 & n 23, reprinted in U.S.S.C.A.N at 740 & n. 23.

13. *See Greebel v. FTP Software, Inc.* 194 F.3d 185, 197 (1st Cir.1999) ("[M]erely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter is not enough."); *In re Advanta Corp. Sec. Lit.,* 180 F.3d 525, 533–35 (3rd Cir.1999)

(Although it may be sufficient for plaintiffs to plead scienter by alleging motive and opportunity as required by pre-Reform Act Second circuit law, the Reform Act's "additional requirement that Plaintiffs state facts 'with particularity' represents a heightening of the [pre-Reform Act Second Circuit] pleading standard." Accordingly, after the Reform Act, "blanket assertions of motive and opportunity" are insufficient because "they do not state facts with particularity or give rise to a strong inference of scienter."); *In re Comshare Inc. Sec. Lit.,* 183 F.3d 542 (6th Cir. 1999); *In re Silicon Graphics, Inc. Sec. Lit.,* 183 F.3d at 978–79; *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282–83, 1286 (11th Cir.

■ The plain language of the Reform Act requires that the Amended Complaint "state with particularity facts giving rise to a strong inference that the defendant [knew that a statement or omission was false or misleading]." At a minimum, this requires that:

(1) For each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false; [14]

(2) Only "particularized" facts can be considered in determining whether the plaintiff has met the pleading burden (*i.e.* it is the particularized "facts" plaintiffs plead that must support the strong inference); [15] and

(3) It is not sufficient for a plaintiff to plead facts that could plausibly be consistent with innocent conduct. To survive a motion to dismiss the facts alleged must create a "strong inference" of wrongful intent.[16]

Whether taken as a whole or examined allegation-by-allegation, the Amended Complaint does not meet these standards and, therefore, must be dismissed.

## III. Analysis

With regard to the alleged misrepresentations in statements or omissions, this analysis will address: (A) initially, whether the complaint is capable of statement-by-statement analysis; and (B) a statement-by-statement examination. A discussion of (C) the alleged GAAP violations follows. Lastly, this analysis addresses an alternative ground to dismiss the action, (D) the failure to adequately plead scienter.

■ As an initial matter, as the pleading requirements demonstrate, "it is *not* the law that a 10b–5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time." *In re Boston Tech. Inc. Sec. Lit.,* 8 F.Supp.2d 43, 55–56 (D.Mass.1998). Instead, to survive a motion to dismiss, a complaint must withstand an exacting statement-by-statement analysis. *See* 15 U.S.C.A. Section 78u–4(b)(2); *Phillips v. LCI International,* 190

1999) (The "statutory language—'required state of mind'—plainly does not refer to motive and opportunity, because motive and opportunity do not constitute a state of mind."). In *Press v. Chemical Inv. Serv. Corp.,* 166 F.3d 529 (2nd Cir.1999), without analyzing the statute's language or legislative history, the Second Circuit stated in a single paragraph of dicta that it regarded the Reform Act as having adopted the pre-Reform Act Second Circuit standard for pleading scienter. The paragraph in *Press* has carried little weight in later appellate considerations of the issue. Indeed, as a later opinion from the Second Circuit demonstrates, whether the Reform Act elevated pleading standards in that Circuit remains an open question. *Kwalbrun v. Glenayre Tech. Inc.,* No. 99–7125, 1999 WL 1212491 (2nd Cir. Dec.16, 1999).

14. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999) (as to scienter, plaintiffs are now required to plead "who, what when, where, and how"); *Greebel v. FTP Software,* 194 F.3d at 195, 202 (plaintiffs required to allege more precisely when facts support-

ing scienter allegations occurred); *In re Silicon Graphics, Inc. Securities Lit.* 183 F.3d at 983–984 (a plaintiff must provide a list of all the relevant circumstances in great detail). And these requirements apply "even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Greebel v. FTP Software,* 194 F.3d at 193 (citation and internal quotation marks omitted).

15. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d at 984–85 (disregarding allegations that were insufficiently particularized).

16. *See Greebel v. FTP Software,* 194 F.3d at 195–96, 202. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 597 n. 21, 106 S.Ct. 1348, 89 L.Ed.2d 538 (emphasis added) (in the context of evaluating the propriety of summary judgment in a case alleging antitrust conspiracy, Court stated "[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

F.3d at 617 ("Having stripped the stock-holders' allegations of mischaracterizations and exaggeration, we focus on whether the exact statement in its true context constitutes a material representation.").[17]

This does not mean, however, that complaints like the instant one may not be dismissed based on their overall defects. Indeed, complaints failing to comply with the Reform Act's requirements must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A) (Supp. IV 1998).

## A. Capability of Statement–by–Statement–Analysis

█ Dismissal for pervasive pleading defects is particularly appropriate when those defects prevent this court from performing the required analysis. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3rd Cir.1992) (remanding with direction that plaintiffs "rearrange the existing allegations into discrete units that are, standing alone, each capable of evaluation under the legal principles we have set forth.") The Amended Complaint here exhibits several such flaws.

### 1. Failure to Specify Why Each "Misstatement" is Misleading

█ Plaintiffs fail to meet the Reform Act's requirement that each allegedly misleading statement be accompanied by allegations explaining why it is misleading. 15 U.S.C. § 78u–4(b)(1). Rather than abiding by this requirement, the Amended Complaint repeatedly refers to a list of alleged operational problems that may or may not have anything to do with the statement.

As Defendants point out, this approach leads to some patently false allegations. For example, the Amended Complaint alleges that statements concerning First Union's expectations for the merger made in the 1998 Second Quarter 10–Q were misleading because they failed to disclose problems the Company was encountering "as detailed in ¶¶ 7 (a) through 7(aa) above." Compl. ¶ 40. Those 27 subparagraphs contain allegations of allegedly "significant and material obstacles" to the CoreStates merger. Notably, many of these events are not alleged to have occurred until months *after* the Second Quarter 10–Q was issued in August 1998. *See, e.g.* ¶ 7(h) (events between October 1998 and June 1999); and ¶ 7(i) (events in November 1998 and March 1999); 7(j) (event in January 1999); ¶ 7(*o*) (events in December 1998). Others have no time frame assigned to them whatsoever. It is Plaintiffs' burden to plead fraud on a statement-by-statement basis and they may not evade that requirement by relying on this Court and the Defendants to try to match particular allegations scattered throughout a sixty-page complaint. Defendants argue that on this basis alone, the Amended Complaint should be dismissed.[18]

### 2. Failure to Allege Scienter With Respect to Each "Misstatement"

█ Further, Plaintiffs make no effort to link their scienter allegations to any specific alleged misstatement. This violates another of the Reform Act requirements: that "the complaint shall, with respect to each act or omission … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Ex-

---

17. *See also Hillson Partners Limited Partnership v. Adage, Inc.*, 42 F.3d 204, 211 (4th Cir.1994) (Court "carefully examin[ed]" each of seven statements to determine whether the "statements constituted violations of the securities laws."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3rd Cir.), cert. *denied*, 506 U.S. 934 (1992).

18. *Shapiro, supra* see also *In re Boston Tech. Inc. Sec. Lit.*, 8 F.Supp.2d at 56 n. 13 (citation omitted) ("Allegations that ultimately are clearly intended to relate to one another are strewn about the Complaint in such a way that their relatedness is apparent only after repeated review of the over fifty page pleading. [But] …, the burden [of matching statement with omission] should not be the Court's.").

change Act Section 21D(b)(2); 15 U.S.C. § 78u–4(b)(2). Instead, the Amended Complaint contains a number of separate sections containing broad allegations that ostensibly relate to scienter, such as Plaintiffs' list of alleged operational issues. Compl. ¶¶ 7, 57. There is, however, no allegation that any item on the list was known to any individual Defendant (or to any of the Company's other senior officials) at the time the allegedly false statements were made.

■ Plaintiffs try to overcome this deficiency through "group pleading," the practice of contending that because of their positions as corporate officers, defendants must have known of the allegedly false and misleading nature of all the alleged misstatements, and are therefore collectively responsible. Compl. ¶ 21. But "group pleading" is clearly inconsistent with Rule 9(b)'s express requirements of specificity. See In re Boston Tech., 8 F.Supp.2d at 57–58 (citations and internal quotation marks omitted) ("As to every piece of alleged bad news in the case, plaintiffs fail to assert any facts as to defendants' knowledge of that news … A 10b–5 plaintiff must allege 'details of [defendants'] alleged fraudulent involvement,' including specifics as to what defendants had knowledge of and when.") It is therefore contrary even to pre-Reform Act law. Apple v. Prudential–Bache Sec., 820 F.Supp. at 987.[19]

The only allegations suggesting that any Defendant was aware of integration issues refer to statements made *after* or at the time that the problems were disclosed. For example, Plaintiffs repeatedly cite statements made by Mr. Crutchfield after the "Class Period." Yet these statements contain no suggestion that Mr. Crutchfield was aware of these issues at the time that the allegedly false statement was made (in some cases more than nine months earlier). This practice of alleging "fraud by hindsight"—claiming that defendants knew of facts at an earlier time based on subsequent disclosures—has been categorically rejected by numerous courts. See, e.g., Hillson Partners Limited Partnership v. Adage, Inc., 42 F.3d at 209.

### 3. Failure to Allege Basis for Beliefs

■ Plaintiffs also fail to comply with the Reform Act's requirement to plead "with particularity all facts on which [their] belief is formed." 15 U.S.C. § 78u–4(b)(1). This requires Plaintiffs to provide facts and disclose sources to corroborate their allegations. See In re Silicon Graphics, Inc. Sec. Lit., 183 F.3d at 985; Apple v. Prudential–Bache Sec. Inc., 820 F.Supp. at 985. This defect is particularly apparent where Plaintiffs allege that the Company was encountering difficulties in the integration process. See ¶¶ 7, 40, and 57. Plaintiffs provide little or no indication of the basis for these allegations. The

**19.** The Third Circuit recently summarized pre-Reform Act law on this point:

Allegations that a securities-fraud defendant, because of his position within the company, "must have known" a statement was false or misleading are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir.1998). Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company. See *Rosenbloom v. Adams, Scott & Conway, Inc.,* 552 F.2d 1336, 1338–39 (9th Cir. 1977) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the

knowledge nor the information necessarily attaches to those positions.")

*In re Advanta Corp. Sec. Lit.,* 180 F.3d at 539. *See also In re Medimmune, Inc. Sec. Lit.,* 873 F.Supp. 953, 960 n. 7 (D.Md.1995) (citations omitted) ("[S]pecific statements must be attributed to specific individuals, *see Juntti v. Prudential–Bache Sec., Inc.,* 25 Fed.R.Serv.3d 1460, 1993 WL 138523 (4th Cir., May 3, 1993). FN7: Plaintiffs rely on the 'group published information doctrine,' which presumes for pleading purposes that officers and directors in day-to-day control of a company are collectively responsible for the company's 'group published' information, such as press releases … That doctrine, however, is squarely at odds with *Juntti* and the Court declines to recognize it.")

Amended Complaint's only effort to provide such a basis is a conclusory paragraph on the first page asserting that Plaintiffs' accusations are based on:

(a) review and analysis of public filings made by First Union Corporation ("First Union" or the "Company"), with the Securities and Exchange Commission (the "SEC"); (b) interviews with former employees of First Union; (c) review and analysis of securities analysts' reports concerning First Union; (d) review and analysis of First Union press releases and reports and articles about First Union and/or the individual defendants in the financial and general press; (e) review and analysis of other publicly available information about First Union; (f) review and analysis of First Union financial statements and reports; and (g) consultation with certified public accountants.

Similar conclusory language has been rejected as "an insufficient basis for fraud allegations because it fails to state with particularity all facts on which [her] belief is formed." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d at 985 (citing 15 U.S.C. § 78u–4(b)(1)). Plaintiffs' failure to plead with particularity the basis for their belief compels dismissal of the entire Amended Complaint. *See Apple v. Prudential–Bache Sec., Inc.*, 820 F.Supp. at 986–87.

## B. Statement–by–Statement Examination

Even if this Court conducts a statement-by-statement analysis of the Amended Complaint, dismissal would still be warranted. Neither of the two sources of misstatements asserted by Plaintiffs, whether the Company's public filings and press releases, or analyst reports and newspaper or journal articles, supports a securities fraud claim.

## 1. Third–Party Analyst Reports and News Articles

▮▮▮▮ Much of the Amended Complaint is based on observations of securities analysts or journalists rather than on statements by Defendants themselves. However, liability may not be based on statements in analyst reports unless plaintiffs allege facts to establish that a specific false statement was actually made by a defendant or that the content of the analyst's report was controlled by the defendant. *See Raab v. General Physics Corp.*, 4 F.3d 286, 288 (4th Cir.1993) (complaint must plead with specificity who allegedly supplied information, how it was supplied, or how company controlled the content of the statement). The same analysis applies to newspaper stories. *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. at 965. Plaintiffs' failure to provide this specificity warrants dismissal of the claims based on third-party reports and articles.

Most of the allegations concerning analysts' reports and news stories during the class period do not identify any statement attributable to the Defendants. For example:

—Paragraphs 41 and 42 focus on reports containing information that was allegedly obtained from First Union management or the Company. These allegations, however, fail to indicate what information was supplied and who among the Defendants supplied it, nor do they indicate how Defendant(s) could have controlled the content of the reports.

—Paragraph 49 alleges that Merrill Lynch Capital Markets issued a "BUY rating" after "direct consultations with First Union management." It fails to allege who supplied what information to Merrill Lynch. Interestingly, that paragraph also indicates that the "CoreStates' integration [was] completed ... successfully" statement was Merrill Lynch's conclusion, not First Union's.

—Paragraph 61 cites a *New York Times* article, but the only statements by First Union referenced in it are unspecified earnings reports that Plaintiffs do not allege are false.

Consequently, none of the foregoing statements can serve as the basis for a claim against Defendants.

The three instances in which Plaintiffs cite analyst reports or journal articles that purport to quote First Union officers are also insufficient to create liability for the Defendants.

First, Plaintiffs allege that Mr. Georgius told analysts that he was "feeling good about where CoreStates is." Compl. ¶ 74. In addition to quoting from a newspaper article published *after* the "Class Period," Plaintiffs omitted a key part of Mr. Georgius' statement. The May 28, 1999 *Wall Street Journal* article read:

> "I'm feeling good about where CoreStates is," John R. Georgius the bank's president, told analysts in March, *though he acknowledged sales gains were slower than expected.*

Appendix Tab 38 (emphasis added). In any event, the "feeling good" statement is immaterial as a matter of law and therefore cannot support liability. *See, Raab v. General Physics Corp.,* 4 F.3d at 289–90; *In re Peritus Software Servs., Inc. Sec. Litig.,* 52 F.Supp.2d at 219 (statement that corporate executives "proud" of their accomplishments immaterial).

Second, Plaintiffs misrepresent the words of an analyst report to turn a comment by Scott Fainor, a First Union vice president, into an allegedly misleading statement of historical fact. Paragraph 46 of the Amended Complaint alleges only that a November 5, 1998 *Morning Call* analyst's report indicates that Mr. Fainor "represented the integration process as working 'smoothly.'" However, the full quote is:

> [T]he problems associated with the CoreStates merger will be minimal. There are thousands of people working to make sure that this integration will work smoothly, if there are issues, we're set up to tackle them immediately. Re-

ferring to the integration process, Mr. Fainor stated, "[w]e're set up to grow, we want to put this behind us and move forward."

In fact, the report from which Plaintiffs extract the cited language clearly indicates that Mr. Fainor was not "representing" that the CoreStates integration process had been "working smoothly." He was commenting on an incident involving certain misdirected letters and predicting that, despite the well-known difficulties associated with the early stages of the massive integration process, First Union had committed sufficient resources to address problems as they arose. The report text reads:

> In June, First Union officials were red-faced when thousands of CoreStates customers received letters informing them that their accounts would be moved to Sovereign. The letters were mailed to the wrong customers. The slip-up surprised folks who keep a close watch on mergers. It wasn't something they expected from First Union, which has carried out multiple mergers. Fainor said First Union officials are prepared to handle problems that arise as the [CoreStates] conversion is carried out this weekend. Fainor said he expects the problems associated with the CoreStates merger will be minimal. "There are thousands of people working to make sure that this integration will work smoothly," Fainor said. "If there are issues, we're set up to tackle them immediately." "We're set up to grow," Fainor said. "We want to put this behind us and move forward."

Appendix Tab 39 (*The Morning Call,* November 5, 1998). Plaintiffs' assertion that Mr. Fainor "intended to convey the false impression that the integration process was proceeding without a hitch" (Compl. ¶ 47) has no support in the evidence.[20]

---

**20.** Further, the *Morning Call* report cannot serve as the predicate for liability because Mr.

Fainor is not a defendant and is not alleged to have acted with scienter.

Finally, Plaintiffs' allegations relating to a November 18, 1998 newspaper article suffer from similar defects. The Complaint alleges (Compl.¶¶ 50–51) that First Union represented in that article that "any integration problems were over" and that "it's now business as usual." First, none of the statements in the article was attributed to a Defendant. More importantly, the statements in the article were uncontroverted by Plaintiffs. For example, the first two sentences (from which Plaintiffs only selectively quote) actually read as follows:

> First Union Corp. said it wrapped up its conversion of the former CoreStates Financial Corp. last weekend. The conversion of three million customers' accounts began Nov. 5 and was completed Saturday.

Appendix Tab 20 (*American Banker,* November 18, 1998). Plaintiffs' allegations about continuing customer service problems cannot render inaccurate the historical fact that First Union actually completed the conversion of particular customer accounts. Also true are the statements (Compl.¶ 50) that the conversion was "the largest and most complex" First Union had ever done and that "there were a few bumps in the road" such as that "[c]ustomers faced long lines at many branches." In fact, the latter statement demonstrates that the market, knew of the very type of discrete problems that Plaintiffs maintain First Union should have disclosed.

Plaintiffs also excise and try to isolate the statement "it's now business as usual" from the following sentences:

> But overall, things went so well that First Union let workers take Veterans Day off instead of taking additional training, said Kim P. Hocutt, vice president of merger support for First Union. About 75 extra workers are being kept in the former CoreStates branches to help out with heavy traffic, said Ms. Hocutt. They are likely to stay there [until] mid-December. Other than that, "it's now business as usual," she said.

Appendix Tab 20. These sentences clearly indicate that Ms. Hocutt, who is not a defendant or member of First Union senior management, did not consider the CoreStates situation to be "business as usual." She was not discussing material matters related to First Union's financial integration of CoreStates. She was merely commenting on the extra staffing requirements needed "to help out with heavy traffic" in various branches. Her statement comes nowhere close to being a viable predicate for Section 10(b) liability for any of the Defendants.

## 2. Remaining Statements Made by First Union

Once the foregoing statements are eliminated as possible sources of liability, all that remains are statements from several SEC filings and press releases. As discussed below, none of the statements Plaintiffs pull from these documents is actionable. Virtually all are statements of optimism or forward-looking projections that cannot be a basis of liability, and the few statements of historical fact are either demonstrably true or not rendered misleading by any allegations supporting falsity.

### a. 1998 Second Quarter 10–Q

■ The Amended Complaint alleges that three statements in the 1998 Second Quarter 10–Q were false and misleading. None of these allegations supports a securities fraud claim.

The first alleged misstatement, that "[w]e are very pleased with our progress in integrating recent acquisitions and with the growth prospects stemming from these transactions" (Compl.¶ 36), is the kind of statement Courts have held to be "puffery" and patently immaterial. *See Grossman v. Novell, Inc.,* 120 F.3d 1112, 1121–22 (10th Cir.1997) (statements of the issuer's president, chief executive officer, and chairman that the issuer "had experienced 'substantial success' in integrating the sales forces of the two companies, that

the merger was moving 'faster than we thought,' and that the merger presented a 'compelling set of opportunities' for the company were immaterial"); *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1219 (1st Cir.1996) (holding the following statements to be "patently immaterial": "[the] company's transition to selling its Alpha chip products was going 'reasonably well'"; company "should show progress quarter over quarter, year over year"; comment that company was "basically on track").

For the same reason, First Union's statements that "1998 will continue to be a very active year" and that "we expect further improvements in efficiency" are not actionable. *Raab v. General Physics Corp.,* 4 F.3d at 289 (statements in annual report that company expected "10% to 30% growth rate over the next several years" and was "poised to carry the growth and success of 1991 well into the future" held to be immaterial "soft puffing" statements).

■ Finally, Plaintiffs cite the 1998 Second Quarter 10–Q prediction that the CoreStates acquisition "will create new opportunities to leverage our growing Capital Management and Capital Markets businesses in states that generate 36 percent of the nation's gross state product and in attractive consumer markets where per capita income is 12 percent above the national average." Compl. ¶ 37.

Plaintiffs fault this prediction not for its factual assertions concerning the size of the potential market, but because the statement allegedly implied that the acquisitions "fortified" First Union's growth potential efficiency and market position. Compl. ¶ 39. But commenting, as First Union did, on the existence of new potential opportunities is not an actionable misstatement. Under *Grossman, Shaw,* and *Raab,* for example, such statements are not actionable. *See also Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 428–29 (D.R.I.1996) (expectation that "1995 [is going] to be a busy year" was

immaterial sales talk; "statement touting 'significance of newly emerging international markets and the vast potential for [defendant's] products in these areas of the world' ... was little more than corporate cheerleading.")

■ Plaintiffs also fail to allege a factual basis for contending that any of the 1998 Second Quarter 10–Q's statements was misleading. The Amended Complaint alleges that First Union should have disclosed that it was "experiencing severe problems in integrating newly-acquired companies into its existing operations or that the process was taking longer and consuming substantially more resources than anticipated." Compl. ¶ 39. For this proposition, the Amended Complaint cross-references the list of events in paragraph 7(a)–(aa). Yet only one of these events is alleged to have occurred as of the close of the second quarter on June 30, or even as of the filing of the 10–Q for that quarter on August 14. In any event, given the scale of the merger, the market would have regarded disclosure of discrete customer service problems associated with the massive CoreStates integration as immaterial. *See e.g. Hillson Partners Limited Partnership v. Adage, Inc.,* 42 F.3d at 213 ("A reasonable investor knows that a capital improvement project may run into unforeseen problems and delays" and therefore no disclosure of such problems is required).

### b. 1998 Third Quarter 10–Q

■ The next allegedly false and misleading statement attributed to a Defendant appears in First Union's Third Quarter 10–Q filed on November 13, 1998 (not, as Plaintiffs state, on November 30):

We have completed the integration of CoreStates. Customers sales and retention strategies are well underway, as well as efforts to achieve expense efficiency targets by the end of 1998. As such we are very pleased with our prospects for revenue growth and. expense

reductions stemming from this and other recently consolidated acquisitions.

Compl. ¶ 53 (emphasis omitted). Plaintiffs contend that the statement was false because "the integration of CoreStates was not completed." *Id.* ¶ 54.

Notwithstanding their assertions, Plaintiffs allege no facts showing that the integration had not actually been completed. Instead, Plaintiffs' only attempt to buttress their assertion of falsity is to refer to their laundry list of alleged customer service and other operational problems contained elsewhere in the Amended Complaint. Compl. ¶ 54. Close inspection of Plaintiffs' list reveals, however, that few of the problems alleged there had occurred before November 1998.

More significantly, these alleged problems did not render false or misleading the statement that "we have completed the integration of CoreStates." That statement connotes only that the process of converting CoreStates branches to First Union branches, information systems and back office conversions was materially complete. This was true when the statement was made. Indeed, some of the very documents referenced in the Amended Complaint show that this statement was factually correct. For example, the *American Banker* article referenced in Paragraph SO of the Amended Complaint states that the conversion of CoreStates' three million customer accounts as well as the conversion of hundreds of computer systems had been completed by the second week of November. Appendix Tab 20.

Beyond that, the quoted statement was, by its terms, a far cry from a declaration that First Union had done everything that needed to be done to make the acquisition a success. To the contrary, it spoke of "[c]ustomer sales and retention strategies" and "efforts to achieve expense efficiency targets" that had begun, but were not completed. Thus, Plaintiffs' assertion that ongoing "sales and retention strategies were not working," Compl. ¶ 54, is of no import. The language in the Third Quarter 10–Q stated only that the strategies "were well underway"; the Company did not guarantee that those strategies would ultimately succeed. Although these efforts may not have achieved what the Company had hoped, the securities laws do not impose liability on corporate managers simply because they are unable to accomplish particular business objectives. Inasmuch as the foregoing statements were not materially false when made, they cannot serve as a basis for Section 10(b) liability.[21]

Finally, Plaintiffs allege that "the Company had no basis to be pleased with prospects for 'expense reductions ...' as [Mr.] Crutchfield revealed after the Class Period, the CoreStates merger was in fact 'crumbling under its own weight.'" Compl. ¶ 54. As noted, remarks such as "we ... are very pleased with our prospects for revenue growth" are patently immaterial and, even if they were not, they cannot be shown to be fraudulent by statements made six months later with the benefit of hindsight.

## C. GAAP Violations

▮ Plaintiffs contend for the first time in the Amended Complaint that Defendants violated generally accepted accounting principles ("GAAP") by failing to record in 1998 the effect of losses in the value of certain mortgage-backed securities. Compl. ¶¶ 91–117. Plaintiffs do not quarrel with the accounting principles First Union employed. Instead, they al-

---

**21.** In addition, even if Plaintiffs had met their burden of pleading falsity or scienter as to these statements, they still would not be actionable because they are too general to support liability. *In re Boston Tech., Inc.,* 8 F.Supp.2d at 62 ("Nor is 'the fundamentals are fine' statement actionable. While the remark may indeed have 'emphasized positive themes and suppressed negative information' [including the decline of certain business], debugging problems with an important computer system, and the net effects of increasing international business, it is vague in meaning and general—too general for a reasonable investor to take into account when making an investment decision.") (citations omitted).

lege that markdowns in the value of these securities in 1999 should have been recognized as losses in 1998, but were improperly deferred to avoid reporting the adverse effects of another 1998 acquisition, that of the Money Store. This is alleged to violate various accounting pronouncements.

The Amended Complaint provides no basis to infer that the Company violated GAAP or that its financial statements in 1998 were misstated in any way. These financial statements were audited by independent auditors, KPMG, who provided a clean opinion that the Company's financial statements were fairly presented in accordance with GAAP. Plaintiffs do not challenge this opinion, nor do they offer any facts to support their allegation that the changes were not properly reflected in 1998. Based on the fact that the securities were re-valued in 1999, they summarily assert, that they should have been re-valued earlier.

The mere fact that accounting adjustments were made in one period does not support an inference that they should have been made in another period as well.[22] Indeed, courts have dismissed substantially similar allegations. For example, the complaint in *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir.1994), attempted to premise a securities fraud claim on defendants' failure to recognize losses on equity securities until year-end. The court dismissed the allegations as legally insufficient, holding:

> Nothing in the complaint suggests that the decision of Bank Shares to delay its equity security loss until the end of the year was fraudulent, even if, as the complaint alleges, it was a violation of [GAAP]. Indeed ... Bank Shares' accounting firm approved the method by which the company recognized its losses, arguably casting doubt on the existence of any impropriety.

*Id.* at 362. In addition, as to allegations that defendants misdescribed the reasons that they manipulated a loan loss provision "to offset the impact of other losses," the court said:

> This conclusory allegation of falsity is unsupported by any specific facts. Plaintiffs offer no basis for inferring that the defendants knew that the bank's loan portfolio was, at that time, improperly characterized as "excellent." They provide no information about the general health of the company's loan portfolio, and fail to cite any specific loans that were in trouble. Defendants' 10–Q states that the decision to reduce the loan loss provision was attributable to, inter alia, the sale of $48 million in loans and the low level of nonperforming

---

**22.** Valuation of mortgage-backed securities such as those at issue here essentially is an exercise in estimating expected future cash flows. By the express terms of the GAAP pronouncements that govern accounting for these securities, a number of variables must be assessed in making such estimates. "All available evidence shall be considered in developing estimates of expected future cash flows." Statement of Financial Accounting Standards (SFAS) No. 125, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," ¶ 44.

In short, the statements Plaintiffs are attacking are classic accounting estimates, where routine changes of the estimate are "necessary consequences of periodic presentations of financial statements." Accounting Principles Board Opinion No. 20, "Accounting Changes," ¶ 10 (hereafter "*Accounting Changes*"). As many courts have noted, esti-

mates are particularly untenable bases for fraud cases. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) ("If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence."), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Plaintiffs' bald allegations fail to distinguish the (fully disclosed) changes made by First Union regarding the mortgage-backed securities from any of the myriad such changes that take place "as new events occur, as more experience is acquired, or as additional information is obtained." *Accounting Changes*, ¶ 10. Alleging that an estimate that was changed in period "Y" instead should have been changed in period "X" cannot transform ordinary accounting events into fraud.

loans. The figures and statistics contained in the document are not alleged to be inaccurate. We consequently find no actionable, particularized. allegation of fraud in this portion of the complaint. *Id.* Plaintiffs' allegations here similarly lack the requisite degree of specificity.

Finally, as a matter of law, the alleged misstatement of earnings of $79 million cannot be material for a company of this size. For fiscal 1998, the Company reported operating earnings before and after merger-related and restructuring charges of $3.7 billion and $2.9 billion, respectively. Appendix Tab 1 (1998 Form 10–K) at 7. The alleged $79 million understatement of losses amounts to a mere 2 .1 percent of operating earnings and 2.8 percent of earnings after such charges.[23]

### D. Pleading Scienter

Next, Plaintiffs' failure adequately to allege scienter provides an entirely independent basis to dismiss the Amended Complaint. As discussed above, the Reform Act requires that, to survive a motion to dismiss, Plaintiffs must plead facts giving rise to a strong inference that a particular defendant made a specific statement with knowledge of its falsity. Further, Plaintiffs are required to plead the requisite scienter with regard to each specific statement. Given the Fourth Circuit's view of scienter and the fact that so many of the alleged misstatements are "forward-looking," Plaintiffs have a particularly heavy burden—they must show that each of the Defendants actually knew that each statement for which he is being charged was false.

Plaintiffs, however, make no effort to show that any Defendant acted with scienter with respect to any specific statement (itself a fatal pleading defect). Instead, they advance four groups of generalized allegations:

(1) after the putative "Class Period," Company officials made statements indicating their hindsight views of problems with the mergers. Compl. ¶¶ 31, 48 (quoting Mr. Crutchfield's comment that "the bank simply had too much on its plate"); ¶ 44 (quoting Mr. Crutchfield's statement on May 26 that Company was "crumbling under its own weight");

(2) the Company experienced certain discrete customer service and other operational problems following the mergers, see ¶¶ 7, 57;

(3) the Defendants were motivated to "conceal the severe problems the Company was encountering in integrating the business and operations of CoreStates" because doing so would "enhanc[e] their executive positions and substantial compensation and prestige they obtained thereby" and would "enhance the ability of First Union to fund acquisitions ... [s]pecifically, [the purchase of] Everen Capital Corporation ..., announced May 5, 1999." Compl. ¶¶ 117, 124; and

(4) the individual Defendants and others traded the Company's stock during the putative Class Period. *Id.* ¶¶ 118–125.

These allegations, either alone or in conjunction with one another, are insufficient to sustain the "strong inference" of scienter required to state a claim for securities fraud.

#### 1. Post–Class Period Statements

■ Plaintiffs' allegations that, after the "Class Period," Company officials

---

**23.** *See, e.g., In re Computervision Corp. Sec. Litig.,* 914 F.Supp. 717 (D.Mass.1996), aff'd, *Glassman v. Computervision Corp.,* 90 F.3d 617, 633 (1st Cir.1996) (motion to dismiss granted where omitted information was 3% to 9% of actual revenues and therefore quantitatively immaterial for purposes of Rule 10b–5); *In re Convergent Tech. Sec. Lit.,* 948 F.2d 507, 514 (9th Cir.1991) (revenues ten percent below target are not actionable); *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir. 1997) (overstatement of assets by $6.8 million, or 2 percent, was immaterial as a matter of law); *In re First Chicago Corp. Sec. Lit.,* 769 F.Supp. 1444, 1454 (N.D.III.1991) (total value of alleged bad loan immaterial in relation to size of defendant's real estate loan portfolio).

made various statements indicating their hindsight-based view that the CoreStates and Money Store mergers had been problematic are unpersuasive. These are classic "fraud-by-hindsight" allegations that are of no probative value in assessing whether any Defendant acted with scienter at the time any statement or omission was actually made. *Hillson Partners Limited Partnership v. Adage, Inc.*, 42 F.3d at 209 ("Mere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)"); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d at 228 ("Class 'cannot use disclosures made after the date of the statement to show that the company knew that problems existed at the earlier date and should have disclosed them'.").

## 2. Allegations Re: Customer Service Problems

■ At various times in the Amended Complaint, Plaintiffs refer to discrete customer service and other operational problems allegedly experienced by the Company, many of which, as Defendants point out, can only be described as trivial. *See e.g.* ¶¶ 7, 57. Plaintiffs imply that, in view of these problems, various statements—generally consisting of predictions of the overall prospects for the Company or for the CoreStates merger—must have been false, and that various persons allegedly responsible for the statements (whom Plaintiffs usually fail to identify) must have known that the statements were false.

Plaintiffs' effort to use these allegations to plead scienter fails for several reasons. First, as noted above, in most instances these alleged problems had not occurred when the particular statements were made.

Second, Plaintiffs fail to allege that the individual Defendants knew about any specific alleged customer service or operational problem. In fact, the Amended Complaint suggests that the Court should simply assume that, "by virtue of [their] high level position[s] with the Company"

the Defendants were "privy to ... [the] information concerning the Company and its business, operations and business prospects." Compl. ¶ 21. But, as discussed above, such "group pleading" is inappropriate, and Plaintiffs' failure to plead what each defendant knew and when compels dismissal of their claims.

In short, Plaintiffs' allegations regarding discrete customer service and other operational problems provide little support for their claim that Defendants acted with scienter.

## 3. Enhancement of First Union's Acquisition Ability

■ Next, Plaintiffs' allegations that Defendants were motivated to "enhance the ability of First Union to fund acquisitions" and "enhanc[e] their executive positions" (Compl. ¶ 124) are also deficient. Almost every corporation and corporate executive has a legitimate interest in maintaining or increasing shareholder value through increased stock prices. Allowing Plaintiffs to satisfy the burden of pleading scienter by making these allegations would obliterate this critical pleading requirement. For this reason, numerous courts applying both pre- and post-Reform Act law have rejected such allegations as a basis for pleading motive in a 10b–5 case. *See, e.g., Salinger v. Projectavision*, 972 F.Supp. 222, 233 (S.D.N.Y.1997) ("It is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital.") Even when a personal motive—to increase compensation—is alleged, it does not satisfy the scienter requirement. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d at 622 (citation omitted) ("Similarly insufficient are allegations that corporate officers 'were motivated to defraud the public because an inflated stock price would increase their compensation'.") [24]

Apart from being legally deficient, Plaintiffs' allegations are actually counterintui-

---

24. *See also Press v. Chemical Inv. Services Corp.* 166 F.3d 529, 538 (2nd Cir.1999); *In re*

tive. Plaintiffs suggest that Defendants concealed problems to inflate First Union's stock price to enhance or maintain the Company's ability to effect mergers. Yet, in January 1999, First Union lowered earnings estimates and, in March 1999, it announced major cost-cutting measures—both negative disclosures. At the same time, the only acquisition First Union announced during this period was its May 1999 purchase of Everen Securities, Inc. Compl. ¶ 117. In other words, the Defendants did not effect any mergers until *after* they had made the very sort of disclosures that could be expected to cause the stock price to. drop. Plaintiffs' own allegations suggest that they are wrong about Defendants' motives—Defendants voluntarily disclosed earnings pressure notwithstanding their purported interest in future acquisitions. In fact, First Union's voluntary disclosure on May 25, 1999, that the Company had once again revised its earnings estimates downwards is patently inconsistent with Plaintiffs' theory that First Union was attempting to conceal the truth. *See In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752(DC), 1998 WL 898334, at *6 (S.D.N.Y. Dec. 22, 1998) ("[T]hat [Defen-

dant] disclosed this negative information, voluntarily, prior to the end of the reporting period, undercuts the claim that Defendant acted consciously to hide the truth or acted recklessly.")

### 4. Insider Trading Allegations

Finally, the Amended Complaint's allegations that the individual Defendants sold stock during the "Class Period" are insufficient to support scienter. Since the Reform Act, numerous courts have recognized that only extraordinary trading activities will suffice. *See Greebel v. FTP Software*, 194 F.3d at 185 (Only trading "well beyond the normal pattern of trading by [the] defendants" can support a strong inference of scienter.).[25] Even prior to the Reform Act, courts recognized that trading must be "suspicious" to support an inference of scienter. *See In re Apple Computer Sec. Litig.*, 886 F.2d at *1117 cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Thus, even large sales with large profits, without more, are not enough to satisfy a plaintiff's burden of pleading scienter.[26]

Against this backdrop, Plaintiffs' allegations regarding "insider" trading

*Health Management Systems, Inc. Sec. Litig.*, 1998 WL 283286, at * 6 [1998 Supp. Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 90,235, at 91,023 n. 4 (S.D.N.Y. June 1, 1998) ("[D]esire to consummate [a] corporate transaction does not constitute a motive for securities fraud."); *Malin v. Ivax*, 17 F.Supp.2d 1345, 1360–61 (S.D.Fla.1998); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1353 (S.D.Cal.1998); *Zeid v. Kimberley*, 973 F.Supp. 910, 924 (N.D.Cal. 1997); *In re Cirrus Logic Sec. Litig.*, 946 F.Supp. 1446, 1477 (N.D.Cal.1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996); *In re Corning Sec. Litig.*, 1996 WL 257603 [1996–97 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 99,244, at 95,376, 95,381 (S.D.N.Y. May 15, 1996); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir.1999).

**25.** *See also In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 553 (Allegations of insider stock sales illustrate that the defendants have motive and opportunity and therefore "do not, without more, suffice to give rise to a 'strong inference' of sciencer."); *In re Silicon Graph-*

*ics, Inc. Sec. Litig.*, 183 F.3d at 970. A rule that failed to consider the circumstances of insider sales would effectively nullify the scienter requirement in corporate disclosure cases, as there is nearly always some selling by officers and directors. At the same time, such a rule would act as an undesirable deterrent to granting stock options to corporate executives, a form of compensation which is advocated because it aligns the respective interests of management and shareholders.

**26.** *See Acito v. IMCERA Group, Inc.*, 47 F.3d at 54 (2nd Cir.1995) (sale of approximately 380,000 shares within two months of the disclosure of the bad news not probative of scienter because the director retained a large number of shares). See also *Duncan v. Pencer*, 1996 WL 19043, at * 11 [1995–96 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,043, at 94,208 (S.D.N.Y. Jan. 18, 1996) (sales by nine defendants totaling $29 million not "unusual"; plaintiff failed to allege shares defendants retained); *In re Buffets, Inc. Sec. Litig.*, 906 F.Supp. 1293, 1300 (D.Minn.1995) (seven defendants' stock sales for millions of dollars

(Compl.¶¶ 118–125) fail, even under pre-Reform Act law.

### a. Trading by Terrence Larsen

Plaintiffs' inclusion of allegations regarding stock sales by former CoreStates Chairman Terrence Larsen in curious and unavailing.[27] Mr. Larsen is not a defendant. Plaintiffs do not allege that he made any actionable misstatement. Consequently, whether Mr. Larsen had a motive to commit fraud is irrelevant.

In any event, Mr. Larsen's trading was neither suspicious nor otherwise probative of any Defendant's scienter. Mr. Larsen's stock sales occurred approximately nine months prior to the beginning of the putative Class Period and therefore cannot support an inference of scienter. *See In re Glenayre Tech., Inc. Sec. Litig.*, 982 F.Supp. 294, 298–99 (S.D.N.Y.1997), *aff'd*, 201 F.3d 431, 1999 WL 1212491 (2nd Cir. 1997). Moreover, according to the article referenced in the Complaint, (Appendix Tab 23), Mr. Larsen sold stock concurrent with his resignation as Chairman of CoreStates, a fact that rebuts Plaintiffs' suggestion that his stock sale was suspicious. *See Provenz v. Miller*, 102 F.3d at 1491 (fact that insider sold his stock when he resigned negated an inference of scienter); *Greebel v. FTP Software, Inc.*, 194 F.3d at 206 (same).

### b. Trading by Messrs. Hatch and Crutchfield

██ Although Plaintiffs note that Messrs. Crutchfield and Hatch sold $1.46

million and $200,000 worth of shares, respectively, even large stock sales are not probative of scienter unless they are significant in comparison to the total number of shares an insider holds. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d at 541; *Acito v. IMCERA Group, Inc.*, 47 F.3d at 54; *In re Buffets, Inc. Sec. Litig.*, 906 F.Supp. at 1300 (seven defendants' stock sales for millions of dollars not suspicious; sales "small compared with total holdings"). Such a comparison completely undercuts their claims.

Moreover, as discussed more fully at oral argument in this matter, both Messrs. Crutchfield and Hatch actually increased their respective holdings of First Union stock during the "Class Period," in part by exercising stock options to acquire stock, Mr. Crutchfield by .64% (3,190 shares) and Mr. Hatch by 17.1% (3,515 shares). Appendix Tabs 41 and 42 (Forms 4 filed by Messrs. Crutchfield and Hatch for transactions during "Class Period"). Additionally, during that period, each of them disposed of fewer than 5% of the total shares and vested options held at the beginning of the period.[28] Such trading activity is insufficient even to plead motive. *Kwalbrun v. Glenayre Tech., Inc.*, 1999 WL 1212491 (11% insufficient); *In re Apple Computer Sec. Litig.*, 886 F.2d at 1117–18 (8% insufficient). Indeed, such a trivial amount of trading affirmatively demonstrates the absence of scienter. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427–28 (9th Cir.1994) (insider's sale of only 5.1% of his

---

not suspicious; sales "small compared with total holdings"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117–18 (9th Cir.1989) (defendants' sale of $84 million of stock, 8% of total holdings, did not give rise to inference of fraud because defendants retained large holdings and trading pattern not suspicious).

27. Plaintiffs' claims about Mr. Larsen's trading are not only legally insufficient but factually inaccurate. According to Plaintiffs, Mr. Larsen sold "nearly all of his First Union holdings ." To the contrary, the article on which Plaintiffs rely states that Mr. Larsen

sold 250, 000 shares but "still holds nearly 500, 000 shares." Appendix Tab 23 (*Philadelphia Inquirer*, December 28, 1998).

28. Both pre-Reform Act Second Circuit law and cases implementing the Reform Act hold that actual stock shares plus exercisable stock options represents the owner's trading potential more accurately than the stock shares alone. Accordingly, vested stock options are considered in evaluating the proportion of stock an insider has sold. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d, at 986–987; *Acito v. IMCERA Group, Inc.*, 47 F.3d at 54.

shares negated an inference of scienter), cert. *denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995).

Other facts in the public record further negate Plaintiffs' claims. For example, many key First Union executives not named as defendants—including the Company's Chief Financial Officer—did not sell a single share.[29] This fact alone is fatal to Plaintiffs' effort to establish scienter through stock sales *See e.g., In re Advanta Corp. Sec. Litig.,* 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported."); *Acito v. IMCERA Group, Inc.,* 47 F.3d at 54 (lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") Moreover, during the "Class Period," First Union was aggressively buying back its stock on the open market, a sign that the Company believed its stock was undervalued, not "artificially inflated." Appendix Tab 43 (November 4, 1998 press release). Indeed, by May 3, 1999, the Company purchased 45 million shares at a cost of nearly $2 billion, hardly the actions of an entity that believed it was withholding "bad news" that would drive down its stock price. Appendix Tab 16 (1999 First Quarter 10–Q) at 14–15.

### c. Trading by Mr. Georgius

■ Plaintiffs' effort to plead scienter thus hinges entirely on Mr. Georgius' trad-

ing. This in itself dooms Plaintiffs' claims. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 814 (2nd Cir.1996) (significant sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent); *Acito v. IMCERA Group Inc.,* 47 F.3d at 54. (requisite inference of scienter lacking when the fraud is alleged to have benefitted only a single defendant in a corporate entity).

Even assuming, however, that trading by a single defendant could serve as a predicate for imputing scienter to the Company and the other Defendants, as Defendants point out, Mr. Georgius' trading was not suspicious considering that Plaintiffs double-count some of Mr. Georgius' sales, and ignore that many sales followed exercise of stock options that required Mr. Georgius to pay the Company the strike price of the options, thus substantially *reducing* his net gain. Appendix Tab 44.[30] The public record also establishes that Mr. Georgius' net holdings of First Union stock actually increased by 3.9% during the "Class Period"—a fact Plaintiffs omit because it is wholly inconsistent with their contention that he knew undisclosed negative information about the Company. Moreover, the bulk of Mr. Georgius' sales occurred during October and November, 1998, prior to the time most of the "integration problems" identified in paragraph 7 of the Complaint arose and, in any event, many months before Plaintiffs claim the "bad news" was re-

---

29. As Defendants noted, Plaintiffs' generalized allegation that "[o]ther [unspecified] First Union insiders" sold an unspecified percentage of their shares "for total proceeds over $48 million" (Compl.¶ 121) is a particularly egregious violation of the particularity requirement. The Company employs tens of thousands of people who, because they are not privy to material inside information, are free to trade in the Company's stock through company plans or otherwise. Accordingly, Plaintiffs' observation about the volume of sales by "insiders" over a nine-month period merits no consideration.

30. Plaintiffs allege (Compl.¶¶ 118–19) that Mr. Georgius sold over 133,672 shares when he actually disposed of 130,688. Appendix Tab 44 (Forms 4 filed by Mr. Georgius for transactions during "Class Period"). Moreover, after paying the exercise price for the options he exercised as part of his compensation package, Mr. Georgius netted slightly more than $2 million, not the $8 million that Plaintiffs claim. Compl. ¶¶ 118–19.

**900**

vealed on May 25, 1999. Those trades therefore are of little probative value. *See In re Glenayre Techs., Inc. Sec. Litig.*, 982 F.Supp. at 298 (sales one month prior to disclosure of adverse information did not support requisite inference of scienter). Between January 1 and May 25, 1999, Mr. Georgius sold less than 1% of the shares, including vested options, he held at the beginning of the alleged "Class Period."

The only supposed misstatement Mr. Georgius allegedly made—a March 1999 statement "I'm feeling good about where CoreStates is" (Compl.¶ 74)—is, as noted above, immaterial as a matter of law. Plaintiffs' strained inference, then, is that the other Defendants conspired to make a series of fraudulent statements for Georgius' benefit and without themselves deriving any meaningful advantage.

For all of these reasons, Plaintiffs' allegations regarding insider stock sales do not satisfy even the less stringent pre-Reform Act pleading requirements (where motive and opportunity were presumptively sufficient). As such, they fall far short of providing the particularized factual showing now required under the Reform Act to support the "strong inference" of fraud. *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d at 970, 987 (No strong inference of scienter where (1) all but two officers of corporation sold a relatively small portion of their total holdings consistent with their prior sales; (2) one officer who had no significant trading history sold 43.6% of his shares, and (3) another officer who did not make any of the allegedly misleading statements sold 75.3% of his shares—a "vast quantity"). For this reason, the Amended complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED THAT** the motion to dismiss (doc. 41) is **GRANTED.**