Bert E. ARNLUND, John C. Cullather, Robert J. D'Amico, Donald H. Duncan, Gregory L. Freeman, Joseph Graziano and Daniel P. Mahoney, Plaintiffs.

v.

Lawrence N. SMITH, William C. DeRusha, Robert L. Burrus, Jr., Eugene P. Trani and Alexander Alexander, Defendants.

No. CIV.A.3:01–CV–105.

United States District Court,
E.D. Virginia.
Richmond Division.

May 29, 2002.

Steven Scott Biss, Richmond, VA, for Bert E. Arnlund, John C. Cullather, Robert J. D'Amico, Donald H. Duncan, Gregory L. Freeman, Joseph Graziano, Daniel P. Mahoney.

John C. Ivins, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, VA, Everette G. Allen, Jr., Allen & Allen, Richmond, VA, for Lawrence N. Smith, Eugene P. Trani, Alexander Alexander.

James Joseph Burns, Williams, Mullen, Clark & Dobbins, Richmond, VA, Samuel Walter Hixon, III, Williams, Mullen, Clark & Dobbins, Richmond, VA, for William C. DeRusha.

James W. Morris, III, Morris and Morris, P.C., Richmond, VA, Michael Robert Ward, Morris and Morris, Richmond, VA, David C. Bryan, Wachtell Lipton Rosen & Katz, New York, NY, for Robert L. Burrus, Jr.

## MEMORANDUM OPINION

SPENCER, District Judge.

This matter comes before the Court on Defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), filed on December 17, 2001. For the reasons discussed below, Defendants' Motion is GRANTED in part and DENIED in part.

### I. BACKGROUND

On November 26, 2001, Plaintiffs filed their Complaint against Defendants, alleging federal securities fraud, common law fraud and conspiracy. Plaintiffs' claims arise out of a series of alleged misrepresentations and omissions surrounding the financial condition of Heilig–Meyers Company ("the Company" or "Heilig–Meyers"), particularly the Company's Annual Report issued on May 30, 2000. Plaintiffs are seven shareholders of the Company and Defendants are members of the Compa-

ny's Board of Directors. The Complaint is quite lengthy and repeats many of the facts essential to the instant motion. What follows is an abbreviated recapitulation of Plaintiffs' *allegations*.

At some point prior to May 30, 2000, Defendants became aware that the Company faced a liquidity crisis. Goldman Sachs had been asked to review strategic alternatives, and in late Spring 2000 to perform a tacit market check to determine whether anyone had significant interest in acquiring the Company. (Second Am. Compl. at ¶ 52.) On May 17, 2000, a special meeting of the Board of Directors ("the Board") was held to discuss the Company's financial position and the impending liquidity issues. *Id.* at ¶ 38. During that meeting, the Board was informed by the Company's CEO and President, William DeRusha ("DeRusha"), that if the Company did not enter into an extension of its banks credit facility by May 25, 2000, the Company would be in default under the terms of that facility. *Id.* at ¶ 39. At that meeting, the Defendants agreed that if satisfactory agreements could not be reached with the lender group by May 25, 2000, the Company should be positioned to file for bankruptcy. *Id.* at ¶ 41.

Defendants scheduled another special meeting for May 24, 2000. At that meeting, Defendants were informed that Duff & Phelps Credit Rating Co. ("D & P") would downgrade the Company's debt after the extended bank facility was signed. The Defendants were also made aware that not all of the banks party to the credit facility had submitted an agreement to revise the facility. *Id.* at ¶ 48.

Another special meeting was held on May 29, 2000. At that meeting Defendants unanimously approved the draft annual report. The Board also gave DeRusha a vote of confidence and decided to retain him as Chairman and CEO.

The Annual Report (Form 10K) was filed on May 30, 2000 with the Securities & Exchange Commission ("SEC"). The Annual Report represented that the Company was solvent; that the Company had grown and was continuing to grow; that there were no significant factors affecting the business of the Company; that the Board intended to continue paying regular quarterly dividends when justified by the financial condition of the Company; that stockholders' equity was $534,748,000.00; that stockholders' equity per share was $8.81; and that the Company had no significant concentration of credit risk. *Id.* at ¶ 82.

The annual meeting of shareholders took place on June 21, 2000. The Board discussed suspension of the payment of the quarterly dividend and authorized DeRusha to suspend the dividend if certain Company officers agreed that a suspension was unlikely to result in both the sale of the Company's stock by a substantial number of shareholders and a negative reaction by the major credit rating agencies. *Id.* at ¶ 105. Also, at this meeting, DeRusha formally requested that the Board consider the termination of his employment and the election of Donald S. Shaffer ("Shaffer") as his replacement. *Id.* at ¶ 66.

The Board conducted a special meeting on July 18, 2000. Representatives of Lazard Freres & Co. ("Lazard"), a New York investment banking firm, were in attendance, and presented a detailed analysis and report of the Company's financial condition and prognosis. *Id.* at ¶ 114. The Board also discussed the fact that the Company's financial future did not look good.

Yet another special meeting was held on July 21, 2000. During this meeting, the Defendants were made aware of the financial implications of DeRusha's termination, primarily the effect his severance obli-

gation would have on the Company. Defendants were notified that the banks would not support a waiver of the covenant violations caused by the accrual of DeRusha's severance obligation. One of the board members asked about the expenses that would be incurred if the Company filed for bankruptcy. *Id.* at ¶ 121.

On July 24, 2000, the Company publicly announced that DeRusha had been replaced as president and CEO. In Form 8–K and its press release, the Company disclosed that DeRusha was entitled to payments of roughly $8.1 million in connection with his departure from the Company.

On August 16, 2000, the Company declared bankruptcy and announced that it would close down its servicing operations. *Id.* at ¶ 136–37. The Company filed its quarterly report with the SEC on November 27, 2000. The report revealed that by August 31, 2000:

- The Company's assets had shrunk by over $611,474,000;
- Total revenues for the quarter decreased by 7.8%;
- Operating expenses exceeded revenue by over $48 million;
- Net loss increased by $536,835,000;
- Accounts payable increased by $27,313,000;
- Loss per share was ($9.71); and
- Total shareholder equity went from $534,748,000 in May 2000 to ($75,057), a decrease of $609,805,000.

*Id.* at ¶ 154.

By April 4, 2001, the Company had put all advertising on hold. *Id.* at ¶ 162. Finally, on April 11, 2001, the Company announced the liquidation and sale of all its stores. *Id.* at ¶ 163.

## II. APPLICABLE RULES AND PRINCIPLES

The Second Amended Complaint alleges that each of the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b)(1994), Rule 10b–5, 17 C.F.R. § 240.10b–5 (1999), and are liable for common law fraud, both actual and constructive, and common law conspiracy. Plaintiffs also allege that Defendants are "controlling persons" of Heilig–Meyers under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and are therefore individually liable for Heilig–Meyers' alleged violations of Section 10(b) and Rule 10b–5.

### A. MOTION TO DISMISS

The function of a motion to dismiss is to test the law governing claims, not the facts which support them. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Spell v. McDaniel,* 591 F.Supp. 1090 (E.D.N.C.1984). When considering such a motion, the Court must presume that all factual allegations in the complaint are true. *See Puerto Rico ex. rel. Quiros v. Alfred L. Snapp & Sons, Inc.,* 632 F.2d 365 (4th Cir.1980). All reasonable inferences must be made in favor of the non-moving party. *See Johnson v. Mueller,* 415 F.2d 354 (4th Cir.1969); *MacKethan v. Peat, Marwick, Mitchell & Co.,* 439 F.Supp. 1090 (E.D.Va.1977). The Court should not dismiss any count unless it appears beyond a doubt that the plaintiff could not recover under any set of facts which could be proven. *See Doby v. Safeway Stores, Inc.,* 523 F.Supp. 1162 (E.D.Va.1981); *Austin v. Reynolds Metals Co.,* 327 F.Supp. 1145 (E.D.Va.1970).

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), not only will the court consider the facts as set forth in the complaint, but the court will also consider the documents attached to the complaint, *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 883, and matters of public record whose authenticity is unquestioned, *Gasner v. County of Dinwiddie,* 162 F.R.D. 280, 282

(E.D.Va.1995). "In securities fraud actions, courts will also examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent." *Id.* (citing *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 617 (4th Cir.1999) (court considered news article and company proxy statement); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1274–1281 (11th Cir.1999) (court considered SEC filings); *In re FAC Realty Sec. Litig.,* 990 F.Supp. 416, 420 (E.D.N.C.1997) (court considered press release, other public statements made by the company, and company's Form 10–K)). In certain limited circumstances, the court may consider non-public documents that have not been attached to the complaint. "[W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment." *Gasner,* 162 F.R.D. at 282. However, the authenticity of such documents must be unquestioned. *Id.*

## B. PLEADING STANDARDS

All of Plaintiffs' claims are essentially fraud claims, since they all involve an underlying allegation of fraud. *See Hillson Partners L.P. v. Adage, Inc.,* 42 F.3d 204, 209 (4th Cir.1994) (Section 10(b));*Evaluation Research Corp. v. Alequin,* 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)(common law fraud); *Adams v. NVR Homes, Inc.,* 193 F.R.D. 243, 250 (D.Md.2000) (conspiracy to commit fraud); *Pitten v. Jacobs,* 903 F.Supp. 937, 951 (D.S.C.1995) (where 10b–5 cause of action fails to survive motion to dismiss, Section 20(a) cause of action also fails). Accordingly, Plaintiffs must satisfy the pleading requirements imposed by Federal Rule of Civil Procedure 9(b).

### 1. Rule 9(b)

Rule 9(b) provides, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Particularity of pleading refers to "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (citing 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed.1990)). *See also In re Criimi Mae, Inc. Sec. Litig.,* 94 F.Supp.2d 652, 657 (D.Md.2000). A plaintiff must identify, with particularity, each individual defendant's culpable conduct; defendants cannot be grouped "together without specif[ication of] which defendant committed which wrong." *Apple v. Prudential–Bache Sec., Inc.,* 820 F.Supp. 984, 987 (W.D.N.C.), aff'd sub. nom. 1993 WL 138523 (4th Cir.1993). In addition, a plaintiff must disclose the sources upon which she bases her allegations. *Id.* at 986.

The purposes of this Rule are to put a defendant on notice of the conduct complained of, to protect a defendant from frivolous suits, to eliminate fraud actions where all facts are learned after discovery, and to protect a defendant from harm to her goodwill and reputation. *Id.* "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*

### 2. The Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act (the "Reform Act"), 15 U.S.C. § 78u–4(b)(2), incorporates the require-

ments of Rule 9(b) and imposes additional ones. The Reform Act imposes heightened pleading standards for plaintiffs alleging that the defendant made a misrepresentation or failed to disclose a material fact necessary in order to make the statements not misleading. The Reform Act requires that plaintiffs specify (1) each allegedly misleading statement; (2) reasons why the statement is allegedly misleading; and (3) if based on information and belief, all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). A plaintiff bringing a private securities suit must not only ensure that the Section 10(b) claim is based on facts, but must also allege that each misrepresentation or omitted fact is material. *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d at 884.

A statement or fact is material "if there is a substantial likelihood that a reasonable investor (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 657 (E.D.Va.2000) (quoting *Gasner v. Bd. of Supervisors,* 103 F.3d 351, 356 (4th Cir.1996)). *See also Basic v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The

determination of materiality is a question of law and fact. *MicroStrategy,* 115 F.Supp.2d at 657 (quoting *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999)). In general, the issue should be presented to a jury. *Id.* However, "if no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor," then materiality should be determined as a matter of law. *Id.* In other words, the statements or omissions must be "obviously unimportant." *Id.*

Moreover, forward looking statements, when accompanied by meaningful cautionary statements, are not actionable even if they are deemed to be material. 15 U.S.C. § 78u–5(c)(1) (Supp. IV 1998). In order to survive a motion to dismiss, a complaint must satisfy the heightened pleading requirements imposed by the Reform Act. 15 U.S.C. § 78u–4(b)(3)(A). This must be done through an exacting statement-by-statement analysis. *First Union Corp. Sec. Litig.,* 128 F.Supp.2d at 886. *See also Phillips v. LCI Int'l,* 190 F.3d at 617.

### III. SECTION 10(B) AND RULE 10B–5 [1]

To state a claim under Section 10(b) [2] and Rule 10b–5 [3], a plaintiff must allege

---

**1.** It appears that only one of the named plaintiffs even has standing to bring suit under Section 10(b). Private claims under Section 10(b) and Rule 10B–5 may only be brought by purchasers and sellers of stock after the date the alleged misrepresentations or omissions were made; a stockholder's decision not to sell his shares is not sufficient. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Gurley v. Documation Inc.,* 674 F.2d 253, 255–56 (4th Cir.1982). Accordingly, only Mahoney and Cullather have standing to assert a claim for securities fraud.

**2.** Section 10(b) provides in pertinent part:
  It shall be unlawful for any person, directly or indirectly, by the use of any means or

instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
  (a) ...
  (b) To use or employ ... any manipulative or deceptive device in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (2002).

**3.** Rule 10b–5 provides:
  It shall be unlawful for any person, directly. or indirectly, by the use of any means or instrumentality of interstate commerce, or

that: (1) the defendant made a false statement or omitted a material fact; (2) the defendant acted with scienter; (3) the plaintiff justifiably relied on the misrepresentation or omission; and (4) the false statement or omission proximately caused the plaintiff's damages. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d at 613. Defendants argue that Plaintiffs' failure to satisfy the heightened pleading requirements necessary for private securities litigation mandates dismissal of the Complaint in its entirety. Specifically, Defendants argue that the statements and omissions Plaintiffs attack in the Complaint are not material. Defendants also offer an alternative ground for dismissal: Plaintiffs failure to establish loss causation. Each of these grounds will be discussed in turn.

## A. ALLEGED MISSTATEMENTS AND OMISSIONS

Plaintiffs allege that Defendants misrepresented several material facts in the May 30, 2000 annual report. Specifically, Plaintiffs accuse Defendants of making the follow misrepresentations of fact:

- Heilig–Meyers (the "Company") was solvent;
- The Company had a book value in excess of $8.80 per share;
- There was in excess of $534,748,000.00 in shareholder equity;
- There was over $142,900,000.00 in good will;
- The Company was "NEW & IMPROVING";
- The Company was in a "classic turnaround situation";
- The nature and amount of the Company's losses;

- The Company's real assets, revenues, income stream and ability to generate revenues, the strength of the customer credit program, servicing operations, operating expenses, accounts payable, the quality of Heilig–Meyers accounts receivable, and the expectation of future loss and uncertainty;
- The special bonuses and other compensation awarded to DeRusha as "performance based" compensation;
- The effect of the bonuses and severance on the financial condition of Heilig–Meyers.

(Second Am. Compl. at ¶ 168.)

Plaintiffs also allege that Defendants failed to disclose information concerning the financial condition of the Company. Defendants' alleged omissions fall into six broad categories of information:

- The Board of Directors' bankruptcy consultations with McGuire Woods;
- The need for special counsel and debt restructuring advisors;
- Discussions with investment bankers concerning "strategic alternatives";
- The positioning of the Company for federal bankruptcy protection;
- The Company's liquidity problems and immediate short-term financial needs;
- DeRusha's termination and the accrual of his bonuses and severance.

*Id.* at ¶ 175.

## B. COMPLIANCE WITH PLEADING REQUIREMENTS

■ What follows is a statement-by-statement analysis of Plaintiffs' allegations.

of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circum-

stances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

1. *Liquidity Crisis:* Heilig–Meyers was solvent; The Company had a book value in excess of $8.80 per share; There was in excess of $534,748,000.00 in shareholder equity; There was over $142,900,000.00 in good will; The nature and amount of the Company's losses; The Company's real assets, revenues, income stream and ability to generate revenues, the strength of the customer credit program, servicing operations, operating expenses, accounts payable, the quality of Heilig–Meyers accounts receivable, and the expectation of future loss and uncertainty; The Board of Directors' bankruptcy consultations with McGuire Woods; The need for special counsel and debt restructuring advisors; Discussions with investment bankers concerning "strategic alternatives"; The positioning of the Company for federal bankruptcy protection

In the Second Amended Complaint, Plaintiffs allege that Defendants knew prior to February 29, 2000 that the Company faced liquidity issues and was on the verge of a financial crisis. (Second Amended Compl. at ¶ 37.) More specifically, Plaintiffs claim that Defendant knew prior to May 30, 2000 that:

A. DeRusha was engaged in negotiations of the Company's revolving credit facility . . . ;

B. The Company faced "certain" liquidity issues . . . ;

C. The Company had engaged Goldman Sachs to perform a "tacit market check" to determine whether there was any interest in acquiring Heilig–Meyers;

D. Prior to May 17, 2000, the Company had sought advice from McGuire Woods concerning bankruptcy;

E. If the Company did not enter into a proposed extension of its existing bank credit facility by May 25, 2000, it would be in default under the terms of the credit facility;

F. The proposed extension of the existing credit facility would not meet Heilig–Meyers' needs due to results of operation below expectations;

G. Additional asset securitization was necessary to provide sufficient funds to prepay the Company's short-term debt;

H. In the even satisfactory arrangements could not be reached with the lender group by May 25, 2000, the Defendant authorized management to "position the company to file for protection under the federal bankruptcy laws";

I. As of May 25, 2000, there was no agreement to extend the revolving credit facility and Heilig–Meyers was in default.

*Id.* at ¶ 22. It is further alleged that the Company's Chief Financial Officer, Roy B. Goodman informed Defendants that even if the Company's credit facility was extended, the extension would "result in a failure to have excess availability for working capital of $20 to $25 million needed to support the Company's trade credit within as little as 90 days." (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss Second Am. Compl. ("Mem. in Opp'n") at 4.) Goodman also told Defendants that management had been advised that Duff & Phelps Credit Rating Co. ("D & P") would downgrade the Company's debt even after the extended bank facility was signed, and that Moody's had the Company under review for a possible downgrade. (Second Am. Compl. at ¶ 48.)

Defendants make two arguments in response: (1) all material events that occurred before May 30 were fully disclosed; and (2) the events that gave way to the Company's filing for bankruptcy arose after May 30. With respect to the first argument, Defendants contend that the liquidity crisis discussed in the May 17 meeting of the Board of Directors was

resolved by May 30, as evidenced by a sticker placed on the "Liquidity and Capital Resources" section of "Management's Discussion and Analysis" of the Annual Report updating the information contained therein. It is Defendants position that their concerns for the Company's liquidity were occasioned by fears that the proposed extension of the existing bank facility would not be entered into by May 25, 2000. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("Mem. in Supp.") at 6.) The May 29 meeting minutes reveal that by May 25 the Company had closed on an extension of its bank credit. (Mem. in Supp., Affidavit of Michael R. Ward ("Ward Aff."), Ex. 4 at 2.) The sticker included on page 40 of the Annual Report stated that "[o]n May 30, 2000, the Company announced it had entered into final documentation to extend its revolving credit facility on substantially the same terms contemplated by the March 22, 2000 commitments." (Ward Aff., Ex. 5 at 40.)

Moreover, Defendants claim that when considering the total mix of information available to investors, Plaintiffs' assertions are completely untrue. Defendants contend that the Annual Report and 10–K accurately describe the Company's troubled finances and operating difficulties. According to Defendants, the Annual Report indicates that for several years the Company had been losing money, its cash supplies decreasing, and its stock price declining. While this may be true, it is not relevant to Plaintiffs' claims that Defendants failed to disclose the specific details enumerated above, or made particular misrepresentations. This argument appears to address whether Plaintiffs reasonably relied on statements or omissions made by Defendants; this matter is not appropriate for resolution on a motion to dismiss.

Insofar as the sufficiency of the sticker, and Defendants' argument that all infor-

mation concerning the liquidity crisis had been resolved prior to May 30, 2000, is concerned, Defendants miss the point. First, on a Rule 12(b)(6) motion to dismiss, all of a plaintiff's allegations are taken as true, and any inferences are to be made in the plaintiff's favor. Accordingly, Defendants' blanket assertion that by May 30, 2000, all liquidity issues had been resolved, in light of Plaintiffs' claim that Defendants withheld and misrepresented material information, carries no weight. Moreover, the sticker does not address all of the alleged misrepresentations and omissions, and in fact, it suggests that all of the Company's liquidity problems had been resolved. This contradicts the advice provided by CFO Goodman during the May 17 Board meeting.

Defendants also claim that the events that led to the Company's bankruptcy actually occurred after May 30, 2000. Specifically, Defendants state that the Company's financial condition as reported in its November 2000 10–Q reflects post-May 30 events, namely the termination of DeRusha, and the Company's bankruptcy filing. Defendants claim that bankruptcy accounting practices and the impact of post-bankruptcy store closings account for almost all of the decline in the Company's asset valuation and shareholder equity. Once again, Defendants miss the mark. Plaintiffs allege that prior to May 30, 2000, Defendants knew and concealed the fact that the Company was in severe financial distress and could be headed for bankruptcy. In support of this allegation, Plaintiffs cite to the minutes of Board meetings, wherein among other things, filing for bankruptcy was discussed in the presence of two bankruptcy attorneys from McGuire Woods law firm. (Ward Aff., Ex. 3; Mem. of Law in Reply to Pls.' Mem. in Opp'n, Ex. 19.) Therefore, it is not the fact that the November 2000 10–Q reflected the poor financial condition of the Company that is at

issue, but rather the underlying need to file for bankruptcy that Plaintiffs attack.

Plaintiffs have plead facts that could lead a reasonable juror to believe that "at the time they were made, the statements either weren't genuinely believed or that there were no reasonable grounds for the belief, or that the proponent knew fact that seriously undermined the grounds for the belief." *Borow v. nVIEW Corp.*, 829 F.Supp. 828, 831 (E.D.Va.1993). Plaintiffs do more than rely on a change in the Company's position to infer fraud; they set out in painstaking detail when Defendants were made aware of material information, based on the Company's own meeting minutes. This detail, coupled with the length of time that elapsed between the dissemination of the Annual Report and public disclosure of the Company's financial condition, may give rise to an inference of fraud. *Compare In re Criimi Mae, Inc. Sec. Litig.*, 94 F.Supp.2d 652, 662 (D.Md.2000) ("Mere proximity in time between optimistic or reassuring statements about a company's prospects and filing for bankruptcy protection does not give rise to a strong inference of scienter when, as here, *the event that forced the company to seek bankruptcy protection did not occur until after the statements were made.*") (emphasis added). Precisely what sent the Company into bankruptcy is a question of fact that is unknown to the Court at this time. Plaintiffs have adequately pled that Defendants knew the Company was headed in that direction before May 30, 2000.

At this juncture, it is not the Court's duty to evaluate whether Plaintiffs' assertions are true, but rather to determine whether their Complaint is sufficient. Defendants claim that dismissal is appropriate because the alleged misstatements or omissions are immaterial, as a matter of law. However, the Court cannot find that the possibility of bankruptcy and a liquidity crisis would be of no import to a reasonable investor.

### 2. DeRusha's termination and his severance package

■ Plaintiffs allege that DeRusha's termination triggered the Company's obligation to make severance payments to DeRusha, which in turn, caused the Company to default under its revolving credit facility. (Second Am. Compl. ¶¶ 64–65, 67.) Plaintiffs aver that

64. DeRusha and the Board knew that under DeRusha's November 1, 1996 employment agreement, upon termination of DeRusha's employment, Heilig–Meyers was required to pay DeRusha further lump sum cash payment as "severance" in the amount of $8,100,000.00.

65. The Defendants knew that Heilig–Meyers was required to accrue the severance obligations in the quarter termination occurred, regardless whether cash was paid to DeRusha during that quarter.

66. DeRusha made the decision to terminate his employment prior to May 30, 2000, but delayed announcing the fact until later. DeRusha and Shaffer discussed the matter. The minutes of the meetings of the Board reveal that DeRusha frequently spoke "informally" with the Board. Upon information and belief, DeRusha "informally" discussed the termination with Burrus and other Board members and advised the directors that he intended to terminate employment. At the annual meeting of the Board on June 21, 2000, DeRusha formally requested that the Board consider the termination of his employment and the election of Shaffer as his replacement ... Prior to May 30, 2000, the Defendants were aware that DeRusha was going to terminate his employment with Heilig–Meyers. The Defen-

dants knew or should have known about the accrual of DeRusha's severance.

*Id.* at ¶¶ 64–66. Although DeRusha's termination was not disclosed until July 24, 2000, the minutes of the May 29 Board meeting lends credence to Plaintiffs' claim that DeRusha's termination was considered prior to May 30, 2000. The minutes reveal that the Board discussed DeRusha's employment and then voted to retain him. (Ward Aff., Ex. 4 at 14.) The fact that the Board voted to retain DeRusha suggests that Defendants were aware of the possibility of his termination.

Defendants argue that DeRusha did not ask the Board to consider his termination until June 21, 2000. The Board then deferred a decision on the issue until July 21, 2000. On July 24, 2000, the Company disclosed the decision to terminate DeRusha in a press release and a Form 8–K, informing the public of DeRusha's right to $8.1 million in severance and the Company's subsequent default under the revolving credit facility. However, Defendants' argument completely overlooks the substance of Plaintiffs' allegations—that the Board knew prior to May 30, 2000 that DeRusha wanted to be terminated, and failed to disclose that fact. Simply because the Board gave DeRusha a vote of confidence and decided to retain him as CEO does not speak to whether the Board knew that DeRusha intended to quit prior to his formal June 21 request. In fact, as previously stated, the fact that the Board had to seriously discuss and vote on DeRusha's employment suggests that DeRusha's employment was an issue. Because Plaintiffs have offered facts supporting their allegations that Defendants knew of DeRusha's tenuous employment situation before May 30, 2000, this claim withstands the present motion to dismiss.

*3. The Company was "NEW & IMPROVING"; The Company was in a "classic turnaround situation"; The Company will pay dividends when dividends "when justified by the financial condition of the company"*

■ Defendants contend in their Motion to Dismiss that the descriptive modifier "NEW & IMPROVING" found in their Annual Report is a forward-looking statement. (Mem. in Supp. at 11–12.) Defendants argue that the statement is "cautionary in nature" and "serve[s] to qualify the balance of the Annual Report," thereby rendering the alleged misrepresentation not actionable. *Id.* at 12.

Without reaching the issue of whether the statement was sufficiently "cautionary," it is unclear whether the statement is actually "forward-looking," and therefore deserving of the deference normally given to such statements. Defendants rely on *Hillson Partners L.P. v. Adage, Inc.,* where the Fourth Circuit held that a company's statement that it "should significantly improve" merely expressed a "hope" that the company would improve in the future. 42 F.3d 204, 212 (4th Cir. 1994).

The statement made at issue is distinguishable as a matter of fact and grammar. While "should [ ] improve" expresses "what is probable or expected" (Webster's Third New International Dictionary 2104 (1971)), "NEW & IMPROVING" indicates present action. "NEW & IMPROVING" indicates that "new" action was taken contemporaneous with the statement to ameliorate the company's financial woes. Consequently, the statement may not be construed as a "projection," a "plan [ ] for future operations," or a statement of "future economic performance." 15 U.S.C. § 78u–5(i)(1).

Since "NEW & IMPROVING" is not to be considered a forward-looking statement, Defendants' must argue that the statement is immaterial. Defendants again rely on *Hillson* to contend that such statements are not actionable unless they are made as "guarantees." 42 F.3d at 216. This, however, is not a valid application of *Hillson*. Rather, the *Hillson* court stated that

> soft, puffing statements ... generally lack materiality .... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market. Moreover, we noted that predictions of future growth not worded as guarantees are generally not actionable under the federal securities laws. *We distinguished expressions of belief or opinion concerning current facts, that may be material from opinions as to uncertain future events ....*

*Id.* (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (remaining citations omitted) (emphasis added)). Thus, since the statement relates to current facts, the language of *Hillson* is unavailing to the Defendants.

Rather, the appropriate inquiry is whether there is a substantial likelihood that a reasonable investor would consider language such as "NEW & IMPROVING" important when determining whether to buy/sell security. Defendants argue that a reasonable investor would not consider such language important since the statement was (1) neutralized by "more specific information" and (2) cautionary in nature, it did not meet the materiality threshold. (Mem. in Supp. at 13.) Defendants contend that the language amounted to mere puffery, and a reasonable investor would recognize it as such.

Defendants' first argument poses difficulties for the fact-finder. That is, whether additional, more factual language may neutralize the puffery. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), holds that additional facts *may* render the statement too unimportant to warrant liability. *TSC Industries*, 426 U.S. at 449, 96 S.Ct. 2126. However, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares*, 501 U.S. at 1097, 111 S.Ct. 2749. This issue appears particularly suited for the fact-finder, lest the additional facts presented in the Annual Report so obviously negate the import of the statement as to render it immaterial.

As to the Defendants' second argument, it is unclear how "NEW & IMPROVING" may be interpreted as cautionary. While "NEW & IMPROVING" may be arguably puffery, it is clear that "[s]tatements of reasons, opinions, or beliefs *are* statements 'with respect to ... material fact[s].'" *Virginia Bankshares*, 501 U.S. at 1091, 111 S.Ct. 2749. In fact, *Virginia Bankshares* holds that conclusory, indefinite assertions (such as where an obviously takeover bid was described by Directors as "high" and "fair") may be deemed material. In light of the foregoing, it appears that this statement should not be dismissed.

Defendants also contend that the descriptive modifier "classic turnaround situation" is a forward-looking statement, and is therefore neutralized by additional facts and caution. Unlike "NEW & IMPROVING," the "classic turnaround situation" is more in keeping with the statutory definition of forward-looking statements. The phrase prognosticates future performance and therefore resembles a "projection," a "plan [ ] for future operations," or

a statement of "future economic performance." 15 U.S.C. § 78u–5(i)(1).

As a forward-looking statement, the analysis of *Hillson* is applicable. In *Hillson*, the court described phrases such as "hope for improvement" and "transition year" as "cautionary language," which is "not usually the stuff of which securities fraud claims are made." *Hillson*, 42 F.3d at 212, 218. Given that the court found "transition year" to be sufficiently cautionary to avoid the materiality threshold in similar circumstances, "classic turnaround year" should be construed similarly. The statement should therefore be dismissed.

■ In addition, Defendants' statement that it intended to pay dividends "when justified by the financial condition of the company" must also be interpreted as a forward-looking statement. "[W]hen justified" is a subsequent condition and therefore looks forward to a future financial upswing to again deliver dividends.

Defendants argue that such statements are not material since a reasonable investor understands that the distribution of dividends is always contingent upon the "performance of other events." (Mem. in Supp. at 13) (citing *Salit v. Centerbank*, 767 F.Supp. 429, 431 (D.Conn.1990); *Graff v. Prime Retail, Inc.*, 172 F.Supp.2d 721, 729 (D.Md.2001)). Plaintiffs counter that notwithstanding the condition subsequent, the Defendants never *intended* to deliver dividends. (Mem. in Opp'n. at 21.) In support of this claim, Plaintiffs point to the timing of two events: (1) DeRusha's recommended suspension of the dividend "until the financial situation improved" three weeks after the Annual Report; and (2) the actual suspension of dividends by the Company five months later. Plaintiffs argue that nothing occurred within the five month period that would justify the suspension.

Plaintiffs' reliance on the timing of subsequent events could be suspect, however.

As *Hillson* notes, "timing has only been considered significant in cases in which there were circumstances other than timing that may have justified investor reliance, such as where a company has made . . . a number of very positive predictions, and in which there were allegations of specific evidence, other than timing, demonstrating that those predictions had no factual basis." *Hillson*, 42 F.3d at 215. Here, Plaintiffs *could* make a claim that the Company's additional allegations and rosy predictions make the timing of the suspension significant in determining the materiality of the representation. Nevertheless, the fact that there is nothing *untrue* about the representation is fatal to the Plaintiffs' assertions. Indeed, a reasonable investor understands that the declaration of dividends is dependent upon the company's financial ability to do so. Therefore, Defendants' statement that it intended to pay dividends "when justified by the financial condition of the company" must be dismissed.

## C. Loss Causation

■ As a preliminary matter, the only plaintiffs that have standing to bring federal securities claims in this case are Cullather and Mahoney. Accordingly, this section addresses whether Cullather and Mahoney have adequately pled and can show that "the false statement or omission proximately caused the plaintiff's damages." *See Phillips v. LCI Int'l, Inc.*, 190 F.3d at 613.

In a suit brought pursuant to Rule 10b–5, a plaintiff must show loss causation: that the misrepresentations and omissions caused economic harm. *Gasner v. Board of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996). Defendants argue that Cullather cannot demonstrate loss causation because he purchased his stock after the Compa-

ny's liquidity crisis had been publicly disclosed.

The Complaint is silent as to when Cullather and Mahoney actually purchased stock in the Company. The Complaint simply states:

2. ... Cullather purchased shares of Heilig–Meyers after reading the May 30 annual report and financial statements. Cullather was so convinced by the Defendants' misrepresentations ... that he sold stock in Carmax (N.Y.SE:KMX) and bought Heilig–Meyers. Cullather's average cost basis is approximately $0.75 per share. The price of Carmax stock increased approximately $12.00 per share since Cullather sold to invest in Heilig–Meyers.

4. ... Mr. Mahoney owns and/or controls 50,200 shares of Heilig–Meyers, which he purchased in two block, 30,000 shares at $19.54 per share, and 20,200 shares at $0.14 per share. Mahoney purchased the latter block of shares as a result of express misrepresentations made by Heilig–Meyers' public relations personnel concerning the Heilig–Meyers' bankruptcy.

(Second Am. Compl. at ¶¶ 2, 4.) The Complaint goes on to state that "[h]ad the Plaintiffs known what was discussed at the special meetings in May 2000, that Heilig–Meyers was really being positioned to file for bankruptcy, they would not have purchased shares ..." *Id.* at ¶ 98.

An investor cannot be said to have reasonably relied on a material misrepresentation or omission such that the inaccuracy caused his loss when that investor is aware of the misrepresentation or omission before purchasing stock. *See Banca Cremi, S.A. v. Alex Brown & Sons, Inc.,* 132 F.3d 1017, 1028 (4th Cir.1997). Defendants argue that Cullather and Mahoney purchased stock in the Company after the post-May 30 disclosure of several relevant pieces of information to the public, including the fact that the Company would not be paying a quarterly dividend, the Company's declining financial performance, DeRusha's termination and severance package, and ultimately the Company's filing for bankruptcy. Defendants attempt to pinpoint the dates Cullather and Mahoney purchased stock in the Company by matching the prices Plaintiffs allege that they paid for the stock with the possible dates the stock traded at those prices.

On this Motion to Dismiss, the Court should avoid the temptation of determining whether Plaintiff Cullather reasonably relied on Defendants' alleged misrepresentations such that he sustained economic losses. Defendants are free to renew this argument on summary judgment.

However, it is appropriate to dismiss Mahoney's claim on a different, independent ground. The losses on shares purchased by Mahoney after the alleged misrepresentations cannot be recovered because Mahoney admits that he did not rely on any allegedly false statement made by Defendants. The Complaint alleges that:

4. ... Mr. Mahoney owns and/or controls 50,200 shares of Heilig–Meyers, which he purchased in two block, 30,000 shares at $19.54 per share, and 20,200 shares at $0.14 per share. Mahoney purchased the latter block of shares as a result of express misrepresentations made by Heilig–Meyers' public relations personnel concerning the Heilig–Meyers' bankruptcy.

140. At or about the time Heilig–Meyers filed for bankruptcy, Shaffer's investor relations team represented to Daniel Mahoney that the bankruptcy was only filed to facilitate a "transition" from "internal financing to external financing", and that "we" will be "through this thing in five (5) weeks and we will be looking good."

141. Mahoney relied upon these representations and purchased more stock. These representations were knowingly false when made.

(Second Am. Compl. at ¶¶ 4, 140–41.) Mahoney concedes that it was the alleged misrepresentation by Shaffer's investor relations team, concerning the impact of the bankruptcy filing that induced him to purchase additional stock in the Company. Shaffer is not a defendant in this civil action. Plaintiff Mahoney does not even allege that Defendants were a part of Shaffer's investor relations team, that they were aware of this allegedly false representation, that they encouraged Shaffer's investor relations team to make it, or adopted the team's position as their own. Mahoney in no way links the individuals he is suing to the statements of others. Accordingly, Mahoney fails to make out a federal securities claim, as well as his common law claims,[4] against Defendants.

### IV. COMMON LAW CLAIMS

■ Plaintiffs assert three common law causes of action: (1) constructive fraud; (2) actual fraud; and (3) conspiracy. To establish constructive fraud, a plaintiff mush show by clear and convincing evidence that: (1) a false representation of; (2) material fact was made; (3) innocently or negligently; (4) the injured party was damaged as a result of his reliance upon the misrepresentation; and (5) the accused has represented as true what is really false, in such a way to induce a person to believe it, with the intent that the person will act upon the representation. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994). A plaintiff alleging actual fraud must show by clear and convincing evidence that: (1) a false representation; (2) of material fact;

(3) made intentionally and knowingly; (4) with intent to mislead; (5) the plaintiff relied on the false representation; and (6) the plaintiff suffered damages as a result. *Id.* "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." *Id.* However, both types of fraud "must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Patrick v. Summers*, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988) (quoting *Soble v. Herman*, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940)).

■ "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985). *See also Commercial Business Systems, Inc. v. Bellsouth Services, Inc.*, 249 Va. 39, 48, 453 S.E.2d 261, 267 (1995). Harm to the plaintiff is an essential element of common law conspiracy. *Commercial Business Systems*, 249 Va. at 48, 453 S.E.2d at 267 ("The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy.").

#### A. COMPLIANCE WITH PLEADING REQUIREMENTS

Recall that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," Fed.R.Civ.P. 9(b), and particularity of pleading refers to "the time, place,

---

4. Mahoney's common law claims are dismissed in section IV.B.2. on identical grounds.

and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999)

▇▇▇▇ Plaintiffs have satisfied the pleading requirements imposed by Rule 9(b). For the reasons discussed in section III.B, Plaintiffs have pleaded with particularity their fraud and conspiracy claims.[5] However, as discussed in section III.B.3, Defendants' descriptions of the Company as being in a "classic turnaround situation" and the Company's statement concerning payment of dividends are not actionable. *See Patrick v. Summers*, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988) (stating that fraud cannot be predicated on statements of future events).

### B. Loss Causation

#### 1. *Plaintiffs Who Retained, Rather Than Purchased or Sold, Their Shares After May 30*

▇▇▇▇ Common law fraud and conspiracy are not governed by the Exchange Act, and therefore are not subject to it "purchasers or sellers" requirement. Accord-ingly, Plaintiffs who retained, rather than sold, their stock based on the alleged misrepresentations and omissions have standing to seek recovery under the common law. However, whether these plaintiffs may actually recover under a common law fraud or conspiracy theory of liability is another matter.

▇▇▇▇ In his Order and Memorandum Opinion in a related case against the accounting firm Deloitte & Touche, L.L.P., Judge Payne dismissed the common law claims of the shareholders who retained their shares based on the alleged misrepresentations of Deloitte because the Amended Complaint "did not establish the requisite causation as to the retaining shareholders." *Arnlund v. Deloitte & Touche, L.L.P.*, 199 F.Supp.2d 461, 490. The plaintiffs in that case are identical to Plaintiffs in the instant case. In addition, Counsel for Plaintiffs concedes that the Amended Complaint in the case before Judge Payne is nearly identical to the Amended Complaint in the instant case.

The doctrine of issue preclusion forecloses the "relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily

---

5. In support of their conspiracy claim, Plaintiffs incorporate all of the allegations set forth in their federal securities claim and add the following allegations:

173. In addition to the egregious misrepresentations in the annual report, the Defendants approved and published the unqualified audit opinion prepared by the accountant, Deloitte & Touche. The audit report diverted the Plaintiffs and brought a false air of legitimacy to the annual report and, as the Defendants expected, facilitated the concealment of Defendants' misrepresentations concerning the "NEW & IMPROVING" Heilig–Meyers. Deloitte & Touche's opinion was completely reckless, false and misleading in that, inter alia, it incorrectly stated that Deloitte had investigated the business and financial reporting of Heilig–Meyers, conducted an audit in accordance with generally accepted auditing standards, and that Heilig–Meyers' financial statements fairly represented the financial condition of the company and were prepared in accordance with generally accepted accounting principles.

200. Defendants combined, associated, agreed or acted in concert both with the accountants, other "professionals" and third parties who prepared and/or participated in the preparation of the Heilig–Meyers' annual report, June 2, 2000 proxy statement (Form 14A), and numerous reports of material events and press releases (Forms 8K), and with others, for the purpose of willfully and maliciously injuring Plaintiffs in their business or investments.

(Second Am. Compl. at ¶¶ 173, 200.)

decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Virginia Hosp. Ass'n v. Baliles,* 830 F.2d 1308, 1311 (4th Cir.1987). While issue preclusion is in the broad discretion of the trial court, courts should not apply it if unfairness results. *Sandberg v. Virginia Bankshares, Inc.,* 979 F.2d 332, 343–44 (4th Cir.1992).

There can be no dispute that Judge Payne's ruling on the defendant Deloitte & Touche's Motion to Dismiss concerning Plaintiff's inability to establish loss causation precludes that issue from being relitigated before this Court. The issue before this Court is identical to the one before Judge Payne: whether Plaintiffs who allege that they retained stock in reliance on alleged misrepresentations and omissions in Heilig–Meyers' Annual Report can establish causation for the harm or economic loss as to maintain a fraud action. Judge Payne found, as a matter of law, that Plaintiffs cannot establish loss causation. Judge Payne's Order dismissing the claims of Plaintiffs Arnlund, D'Amico, Duncan, Freeman, and Graziano is final. His ruling on loss causation as it relates to pre-May 30 purchasers' common law claims was necessarily decided, since he could not have dismissed their causes of action for fraud and conspiracy without ruling on loss causation. Finally, these plaintiffs were also plaintiffs in the suit against Deloitte & Touche and were afforded a full and fair opportunity to litigate. Accordingly, Defendants' Motion to Dismiss these plaintiffs for failure to establish loss causation must be granted.

### 2. *Plaintiffs Who Purchased Shares After May 30*

██ For the reasons fully discussed in section III.C of this memorandum, Defendants' arguments concerning Cullather's ability to prove that the alleged misrepresentations and omissions caused his eco-nomic loss is more appropriately considered on a summary judgment motion.

As a matter of law, however, Mahoney's common law claims must be dismissed. Mahoney admits that he purchased shares after May 30, 2000 as a result of alleged misrepresentations by the Company's public relations personnel concerning the significance of the Company's bankruptcy. (Second Am. Compl. at ¶¶ 4, 140–41.) He concedes that he did not rely on Defendants' alleged misrepresentations in purchasing additional shares. Accordingly, his claims must be dismissed.

### V. CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED in part and DENIED in part. The Motion to Dismiss is GRANTED with respect to Plaintiffs Bert E. Arnlund, Robert J. D'Amico, Donald H. Duncan, Gregory L. Freemen, Joseph Graziano, and Daniel P. Mahoney. Accordingly, Plaintiff John C. Cullather is the only plaintiff that remains in this action.

In addition, Defendants' Motion to Dismiss Plaintiffs' allegations concerning the following statements is GRANTED:

- The Company was in a "classic turnaround situation."
- The Company will pay dividends "when justified by the financial condition of the company."

Except as expressly mentioned above, the remainder of Defendants' Motion is DENIED.

An appropriate Order shall issue.

### ORDER

This matter comes before the Court on Defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), filed on December 17, 2001. For the reasons discussed in the accompanying

memorandum, Defendants' Motion is GRANTED in part and DENIED in part.

It is hereby ORDERED that:

(1) Defendants' Motion to Dismiss is GRANTED with respect to the federal securities fraud claim and all common law claims of Plaintiffs Bert E. Arnlund, Robert J. D'Amico, Donald H. Duncan, Gregory L. Freemen, Joseph Graziano, and Daniel P. Mahoney. These claims are DISMISSED with prejudice;

(2) Defendants' Motion to Dismiss is GRANTED with respect to the federal securities fraud claim and all common law claims of Plaintiff John C. Cullather for shares of Heilig–Meyers Company purchased prior to the issuance of the May 30, 2000 Annual Report of Heilig–Meyers Company, as to which losses are claimed for having retained said shares. These claims are DISMISSED with prejudice;

(3) Defendants' Motion to Dismiss Plaintiffs' allegations concerning the following statements is GRANTED:

- The Company was in a "classic turnaround situation."
- The Company will pay dividends "when justified by the financial condition of the company."

Except as expressly mentioned above, the remainder of Defendants' Motion is DENIED.

Let the Clerk send a copy of this Order to all parties of record.

It is SO ORDERED.